29699. SMITH *v.* HANNA MANUFACTURING COMPANY.

DECIDED DECEMBER 4, 1942.

*Tolnas & Middlebrooks,* for plaintiff.

*W. A. Slaton, W. W. Armistead, Erwin & Nix,* for defendant.

MACINTYRE, J. F. R. Smith brought suit in Clarke superior court alleging in his petition as amended that he was then, and had been for twenty-five years, the owner of a tract of land of 706.67 acres in Oglethorpe County; that the sheriff had levied on said tract seven tax executions for seven years back taxes for the State, the county (Oglethorpe) and school taxes, for 1925 to 1931 inclusive, and had sold the same under one levy for $1194.82. The plaintiff contended that the levy, sale, and deed were void because : "(a) The tax fi. fa. for the year 1925, was not signed by the tax collector, and was dormant, and therefore the entire levy and sale

was void. (b) The tax fi. fa. for the year 1926 was dormant, and that the entire single levy under all the fi. fas. and the sale pursuant thereto were void. (c) The property was assessed for taxation during said years for from $5050 to $5100, and was worth from $5100 to $8000, and was capable of subdivision and sale in parcels or separate portions, so that as little as 170 acres of land would have sold for enough to pay the taxes, and therefore the levy was excessive and the sale and tax deed void."

Plaintiff also alleged that at the time the timber was cut and removed from the premises the tax sale had not been completed, because Oglethorpe County had not paid to the sheriff the full amount of the purchase-price or bid at the tax sale, nor had that portion of the taxes for which the property had been sold which was due the State of Georgia been remitted or paid to the State of Georgia; that at the tax sale the conveyance was made to R. O. Smith, commissioner of roads and revenue for Oglethorpe County, and that on July 2, 1940, Oglethorpe County, through its proper officers, executed and delivered to Coile Escoe a timber agreement for the cutting and removing of certain timber from this land, and that Escoe, as privy in estate with Oglethorpe County, for the same reasons, acquired no title to the timber; that Escoe, beginning July 2, 1940, entered on the land and cut and removed pine and oak timber which he sawed into 341,881 feet of lumber, and that the defendant received said lumber, took possession of the same and applied it to its use, having sold the lumber and retained the proceeds thereof for its own use; that the lumber at Athens, Georgia, where the defendant converted it to its own use was worth $20 per thousand feet, or a total of $6821.62; that plaintiff is the owner of said lumber, having been and being the owner of the land from which it was cut, and has the right to immediate possession of same. Demand and refusal were alleged and admitted.

The defendant denied that the levy was excessive, and that the tax sale was void as alleged by plaintiff. The defendant further alleged in substance as follows: that it bought the lumber from Escoe in good faith for value in the belief that it was getting good title thereto; that Escoe did have good title to said lumber and the right to convey same to defendant, and that the defendant did acquire good title thereto from Escoe; that, under all the facts, plaintiff is estopped to contend that Escoe did not have good title to the

lumber and the right to convey same to defendant, and is estopped to maintain this suit against defendant; that the timber cutting by Escoe commenced during the latter part of August 1940, and continued until on or about December 28, 1940, and that Escoe sawed the timber into 341,581 feet of lumber and sold same to defendant; that in the latter part of August 1940, when little timber had been cut by Escoe, a question arose concerning the boundaries of the land; that the county commissioners, in an effort to get accurate information for the purposes of timber cutting, had inquiry made of plaintiff about the boundaries; that plaintiff, knowing the circumstances, and knowing that the information was sought for the purpose of informing Escoe within what boundaries he could cut the timber, made no claim that either the county or Escoe was acting wrongfully in making the timber contract, or in having the timber cut and removed, but, on the contrary, plaintiff expressed his belief that he could give correct information about the boundaries, and also his willingness to do so as soon as he could go to the land for that purpose; that before plaintiff, who was residing in Atlanta, got to the farm, timber cutting had been resumed; that shortly thereafter plaintiff did go to the land and visited Escoe's son who was in charge of the sawmill; on leaving the sawmill he met Escoe about two miles away and talked with him, saying that he did not blame Escoe for buying the timber, and again visited the sawmill later during the year 1940, saw the timber cutting and sawing still going on, and again talked with Escoe; that plaintiff never made any claim on either of these visits, or at any time before Escoe finished cutting the timber, that the county did not have good title to the land or did not have the right to make the timber contract with Escoe, or that Escoe did not have the right to cut and remove the timber; that Escoe bought and paid for the timber, and cut, sawed, and removed the same, all in good faith and in the belief that he was getting good title thereto, and that plaintiff, with the knowledge that Escoe was so acting in good faith, and with ample opportunities to inform Escoe of the alleged rights now set up by plaintiff in his suit, refrained from doing so, and refrained from giving Escoe any warning to the effect that Escoe would not have good title to the timber and lumber.

Concerning plaintiff's allegation that he "is now" the owner of the land upon which the timber was grown, defendant answered:

"For want of sufficient information, defendant can neither admit nor deny that allegation, for the reason that, after the county's sale of the timber to Escoe and while Escoe was having the timber cut and removed, the county sold and conveyed the land at plaintiff's instance to plaintiff's daughter; the legal effect of that conveyance being to convey to plaintiff's daughter title to the land, less the timber which Escoe was cutting and removing under the county's prior conveyance of said timber to him. Defendant denies that plaintiff now holds any title to the land unless plaintiff holds under the said deed made by Oglethorpe County to plaintiff's daughter, which was and is subordinate to Escoe's right to the timber and to defendant's title to its lumber bought from Escoe."

Defendant amended its answer by adding two paragraphs, 18 and 19. In paragraph 18, defendant, who had already alleged that it bought in good faith and for value from Escoe, alleged further that Escoe was an innocent purchaser for value of the timber from Oglethorpe County, without any notice of any defect in the title of the county, and defendant then alleged the kinds and amounts of expenses incurred by both Escoe and defendant in making the timber merchantable; all amounting to $7051.98, which defendant was entitled to have credited against the value of the lumber sold in the event of recovery by plaintiff. The second paragraph of the amendment, numbered 19, was as follows: "Defendant further says that the sale of the land by Oglethorpe County to plaintiff's daughter, mentioned in paragraph 16 of this defendant's original answer herein, was made at plaintiff's instance; was made subject to the rights of Escoe under the county's previous sale of the timber to said Escoe; was made for the sum of $1500, which was less than the amount which plaintiff would have had to pay to redeem said land; that plaintiff caused the land to be so sold to his daughter for the purpose of getting his land back by such purchase cheaper than could be done by redemption, and for the further purpose of freeing the land from the encumbrances of the two security deeds which plaintiff had created against said land, securing debts that were still wholly or partly unpaid. Defendant says that plaintiff, by his conduct in connection with said transaction, waived any right or privilege that he may have had of redeeming said land, and ratified the tax sale and tax deed under which the county had acquired title to said land in 1934, and ratified the

county's sale of the timber to Escoe. For these additional reasons, plaintiff has no right to maintain this suit against this defendant, vendee of said Escoe, and has no right to recover any amount in this case."

The question presented is, did plaintiff's conduct, even if the tax deed did not convey title, and the plaintiff still had title in himself to the land and the timber which was "cut" from said land, or rather the lumber into which it was manufactured thereafter, estop the plaintiff from asserting his title against the defendant, a bona fide purchaser for value? It may be here stated that if the plaintiff was estopped from denying title as against Escoe, who bought the timber from the purchaser at the tax sale, he would also be estopped from denying title against the defendant who bought the timber from Escoe. It appears from the evidence that the chairman of the county commissioners was a friend of the plaintiff, and that the plaintiff was a friend of the county attorney, and had also been a friend of the father of the county attorney, and there was a disposition on the part of the commissioners to be patient with the plaintiff in his nonpayment of the taxes. The record shows from the correspondence between the county attorney and the plaintiff that the plaintiff was seeking to get the county attorney to aid him in postponing the payment of his taxes, although more than seven years had elapsed since he had paid any. The county attorney was both patient and considerate of the plaintiff, but nevertheless told him that he merely represented the commissioners in his legal capacity and that he had always refrained from seeking to interfere with the official conduct of the county commissioners, except when called on for legal advice. On January 3, 1938, after the execution of the tax deed the county attorney wrote the plaintiff: "Your letter received. You state that you do not know who is pressing the matter. The commissioners gave me a bunch of deeds to property that had been sold for taxes with instructions to take the necessary steps to get possession of the property and this property was sold in June 1934, I think it was. I am sorry to learn that you do not feel well, but I do hope that you will soon be able to give this matter the needed attention." Again, on May 24, 1938, the county attorney wrote plaintiff: "I have not heard from you in some time. The county is preparing to enter possession of the land under its sheriff's deed,

and I am giving you this notice so that you may take any steps you wish. I was in hopes that you could come down in the hope of working it out but I do not know of anything else that I can do." Again, on May 30, 1938, the county attorney wrote plaintiff: "I received your letter relative to the land. I also saw the one you wrote to Mr. Otis Smith [chairman of the board of county commissioners], in which you said that Mr. Hamp McWhorter would see him Friday. Nothing·has been done, and I did not want you to be under any misapprehension as to what was being done. The county is going into possession under its deed, and may begin cutting some timber on the place. I wish there was some way it could be avoided."

On August 23, 1940, the county attorney telephoned the plaintiff over long distance, asking him if he could come to Oglethorpe County and help them to fix one of the land lines to this tract of land,·which was somewhat uncertain. On August 31, 1940, the plaintiff, in reply, wrote the county attorney: "Dear Judge: My boss did not return till Friday. Now, Judge, to trace lines on the land referred to would take time and labor. I am in no condition at present to do this, as I am quite weak from chronic case bronchitis. If I knew which line was in question am sure could straighten out same by writing it. Soon as I can get some strength I intend running down there and will let you know when." On October 11, 1940, the county attorney wrote the plaintiff:. "Mr. Otis Smith [chairman of board of county commissioners] has asked me to write and ask if you would execute warranty deed to the county to your farm which was sold several years ago for taxes. I have written you that the county had been in possession of this for a long time. Please let me hear from you, and oblige."

To dispense with formal proof of certain conceded facts, the parties made a stipulation in substance as follows: "That on the date of the tax sale, November, 1934, plaintiff was the owner of the land in question subject to outstanding loan deed that had been executed by him [the details of the loan deeds and the debts secured thereby being stated in the stipulation]; that, of the sale price at the tax sale of the land in question $1233.19, the commissioner of roads and revenues of Oglethorpe County paid the sheriff $38.37 to cover the cost of levy, advertisement, and sale commission; and that the remainder of the bid, $1194.82, was not paid by the county to the

sheriff, nor by the sheriff back to the county; although the sheriff gave the county a receipt for the amount of the entire bid; and the commissioner gave the sheriff back a receipt for the amount of $1194.82 as the net proceeds of the sale; that no amount was paid at the time of the sale, either by the sheriff or by Oglethorpe County, to the State of Georgia, as to the State's proportionate part of the taxes on said land; that, in July 1940, the commissioners of Oglethorpe County executed to Escoe a conveyance of the timber on said land for $325, and received that amount from Escoe; and that, in November 1940, said commissioners executed to Mrs. Birdie Smith Houser its conveyance of said land for $1500, receiving that amount from her; that on September 22, 1941, the commissioners paid the State $900, which included, in addition to other items not involved here, the State's proportionate share of the taxes shown by the executions under which the tax sale was made; and that no previous payment had been made to the State of Georgia on its proportionate part of said taxes; that the excess of the amounts received by the commissioners of Oglethorpe County from Escoe and Mrs. Houser, over the amount paid therefrom to the State on September 22, 1941, was applied by the commissioners on the county's share of said taxes."

The evidence was conflicting on the issue of alleged excessiveness of the levy. It was undisputed that plaintiff did visit Escoe's sawmill on two occasions as alleged by defendant; and that the timber cutting and sawing were being done on each occasion, and were seen by plaintiff, as alleged by defendant. Also it was undisputed that, during the early stages of the timber cutting, Oglethorpe County, through its county attorney, communicated with plaintiff by telephone to get information about the boundaries of the land, and that plaintiff agreed to supply the information.

Concerning the agreement of the county, through its commissioners, at a meeting of the same, in November 1940, some six years after the sheriff's tax deed to the county had been executed on Nov. 6, 1934, at which they agreed to make a deed to Mrs. Houser, the daughter of the plaintiff, Mr. Hamilton McWhorter, an attorney who was present at this meeting, testified: "I reside in Lexington, Georgia, where I am a practicing attorney with my son Hamilton McWhorter Jr.; Mr. F. R. Smith, the plaintiff in this case, conferred with me with reference to some land [the

property in question] that he owned in Oglethorpe County which was sold for State and county taxes and bought in by Oglethorpe County. Mr. Smith and I conferred quite a number of years. I represented Mr. Smith quite a number of years. I could not tell you exactly when it was; it existed for some time discussing the tax situation here; it was his desire to redeem the land if he could get up the money to do it. Mr. Smith had this tract of land that we know as the 'flat-woods' tract of land, and he also had some property in Lexington. The flat-woods land had been sold for taxes back sometime prior to the time it was undertaken to redeem it. Mr. Smith and I had repeated interviews or conferences about redeeming the tract of land or paying up the taxes on it. I suppose that existed for probably a year, or maybe a couple of years. Finally Mr. Smith or I got notice, I don't know which, that the county was going to sell the land on the first Tuesday [this was several years after the sheriff's sale under the tax fi. fas.]. I think that was last February or January, I have forgotten which. However, I think it was sometime last year. I am talking about selling it when Mrs. Houser bought the property. I do not remember the occasion of the property being sold for taxes as I was not present. This deed from Oglethorpe County to Mrs. Houser dated November 5th, 1940, and certified copy of a resolution refreshes my memory on that transaction. It was in November. Mr. Smith notified me that he had been down here somewhere, and that he had found out they were going to do something about it on the first Tuesday in November 1940, and that he was very anxious for somebody else not to get the land.

"I advised Mr. Smith that if he redeemed the land I knew there were some liens against the land and it would contribute immediately to the benefit of those lien holders; and he said that his daughter, Mrs. Houser, would furnish the money and he wanted me to talk to Mrs. Houser, and I talked to her once in person and talked to her once over the telephone, and my advice to Mrs. Houser was, she could buy the land from the county for $1500, and I thought it was a good investment, and she was very anxious to buy it for $1200, and my recollection is she gave me when I left Atlanta one check for $1200 and one for $1500; and my recollection is that I went before the commissioners on the first Tuesday in November, 1940, and I tried to buy the land for her for $1200,

and they told me that they had a bid for $1200 and probably more, but that they would take $1500 if some other party did not offer more. So the party came in—the party himself did not come in. Mr. Watkins was interested in it so they said. He did not come in. One of the commissioners had somebody, Mr. Bray, and he said his man would not pay the $1500, so they agreed to sell it to Mrs. Houser for the $1500, and I gave the checks to Mr. R.. O. Smith with the instructions that my son would join with the county attorney and get the deeds straight to Mrs. Houser.

"In that dealing they told me, which I knew and which Mr. Smith knew, that the timber had been sold to Coile Escoe, and they told me that was the only way they could sell it, was subject to that timber lease to Mr. Escoe. That was understood between the commissioners and me. They called my attention to it and it was understood. I instructed my son to be very careful to see that the tax fi. fas. had been recorded with the tax deed, because I told Mrs. Houser I would be. She was very anxious to be careful and I instructed him that Mrs. Houser was relying on me to see about it. On the sale to Mrs. Houser the price was $1500. My understanding was it took about $2000 to redeem the land; so that the sale to Mrs. Houser was for less than the amount owing to the State and county for taxes. Mr. F. R. Smith and myself—he knew that the sale to Mrs. Houser was being made subject to Escoe's rights. That was discussed between Mr. Smith and myself."

The plaintiff testified: "I am the owner of that 707 acres of land in Oglethorpe County, the timber on which is the subject-matter of this suit. I heard Mr. Armistead testify on the stand this morning. When Mr. Armistead called me over the telephone on August 23rd, 1940, he said: 'Frank, could you come down here and show us the line on your plat?' and I said: 'No, I am not well but you can see Mr. Will Partain down there and he ought to know the lines.' And he says: 'No, we have seen Will Partain and he doesn't know them.' And I says: 'If he doesn't know them, Sam Partain, who lives in Athens now, knows it better than I do.' He never called Coile Escoe's name to me over the telephone or said one word about the timber. The first time I ever discovered that this timber was being cut off my land by Coile Escoe was about October, between the 20th and 25th of October, right along in there, is my best recollection. I made a trip there at that

time with Mr. Michem. On my way down to Oglethorpe County I stopped at Crawford to see Mr. Armistead. I said: 'How are you, Judge? Did you get the land line straightened out?' And he said: 'Oh, Mr. Frank, don't ask me that, see the commissioner.' And I said: 'No, I don't want to go and see him; I understand that he has been disabled a little bit and not in a condition to see any one.' And he said: 'Mr. Frank you go down there. I am in a hurry. I have to run and see my wife just as quick as I can.' And he ran off and went out of the door immediately, and I said: 'Look here.' And he said: 'Don't ask me anything; go and see Mr. Smith.' He did not say anything to me at that time about the sale of the timber to Coile Escoe. The word timber was never mentioned to me at that time. I begged him not to sell the land, but there was no discussion about the timber one way or another. Then we stopped at the house of Mr. R. O. Smith, the county commissioner, and I saw him. We had always been friendly and engaged in conversation and I said: 'Did you get the land line straightened out?' And he said: 'Yes, Sam Partain straightened it out.' And as I was going to leave he said: 'We got a little bridge timber.' And I said: 'What, on the place?' And he said: 'Yes.' And about that time we left, and that was all that was said about that. That was absolutely the first time I ever heard of the timber being cut off my place at that time.

"Then we went to Mr. Will Partain's house and spent the night there, and the next morning we went down there to my place, about a quarter of a mile, and drove down to the mill. I heard the mill running before I left Mr. Partain's house, and I said: 'Don't you hear the mill running?' and he said: 'Yes.' First I asked him when it started running, and he said the mill had been there several months. We drove down there and we saw the most immense pile of slabs I ever saw in my life. Mr. Coile Escoe's son was the first one we approached. I said: 'What in the world are you all doing, where is your father?' And he said: 'He is at home, I expect somewhere up there.' And I asked him how long the mill had been running and he said: 'We have been sawing here for sometime. Are you going to stop father from sawing?' And I told him: 'I am going to do what I can to protect my rights. I never heard of such a thing like this, about a sawmill on my land.' That was the first time I ever knew a sawmill was on my

place or they were cutting trees there, the first time I ever heard of it.

"I went over there to Escoe's house after leaving the mill, and I was pretty upset as anybody would be, and the yard was covered, and there were four or five hundred logs on the yard, and not one stack of lumber stacked there at all. I met Escoe on the road and said to him: 'Look here, Escoe, how did you get your sawmill on my land?' And he said: 'Mr. Frank, I bought it from the county, from the commissioner, Otis Smith.' And I said: 'He had no right to do that, and somebody has got to pay for it.' He said: 'Mr. Frank, I thought I was doing right.' And I said: 'I don't blame you for buying it as cheap as you could.' And I asked him about the commissioners, who they were, to find out who they were. I think there were five at that time. I asked the names of them if he knew them, and he said he didn't know but one or two, and I said: 'I don't know who to jump on but I have to get at somebody for taking my timber.' Mr. Michem heard nearly all of that last.

"In connection with this deed that my daughter got from the county, I did not put one single solitary dollar of my own in carrying out that transaction. She bought it as an investment on the recommendation of Mr. Hamilton McWhorter. I knew nothing about the sale. It was Mrs. Houser's, my daughter's, money. I have not had any money of my own in the last few years. I was born in 1861. I lived in Oglethorpe County since 1877, part of the time. My daughter is a widow and I am staying with her. When my daughter bought this land I knew it was going on. How I knew the sale was going on, one time I asked my daughter to help put the money up and get out of the picture. That occurred after I found out that they were going to force me to settle up the taxes, two months before. She bought it on November 6th, 1940. It wasn't that far back, because in September I didn't know a thing about it. In point of fact, I had been talking with Mr. Mc-Whorter about redeeming that land. He always represented me, and I never had court cases. I went to him for advice and he was my attorney. I talked to him at different times, and I thought I could get some one to put up the money. I mean my daughter. I had been living with her six or eight years. I inquired how much money it would take to redeem the land and I think Hamp

intimated something like $3000 or $3500, and I found out that she could get it for $1500, so I tried to borrow the money from her to get it myself, and she and McWhorter thought it was better for her to buy it, and that was without my knowledge. I didn't know about it. We were living in the same house. We didn't discuss it. That is the facts, except as about borrowing the money for me to buy it. I knew she bought it and I say 'I own it now. It belongs to me. I always had a good claim for it.

"They sold my land when they didn't have a right to do it. McWhorter advised me it was illegal, every bit of it, and that I could get it back. My daughter might think she owns it as she furnished the money and they made a deed to her of it, but I claim the land and the place belongs to me as this deed is no good. I claim my daughter's deed from the county is no good. I have never made her a deed to it. I do not mean to tell this jury that my daughter, through Hamp McWhorter, bought that land out from under me without saying a word to me about it. I knew she wasn't getting anything. I was not taking that method to relieve the land of the liens and claims against it. I am keeping nothing back. You don't catch my mind exactly. I knew my daughter bought the land the day it was sold, because McWhorter was the one who bought it. I don't know who told me; I think McWhorter did. I was there the day he bought the land for my daughter. I knew something was going to happen and I went down there just to be sure. I was there. I was there frequently. That was the first Tuesday and a lot of people go there the first Tuesday when property is sold. I took a note and gave it to Mr. Mc-Whorter from Mrs. Houser, and I think the checks were in that envelope. When Mrs. Houser bought the land from the county she bought it through McWhorter, and I acted as her messenger to carry a note to Mr. McWhorter and the checks that he paid to the county for the land, and I knew that the checks were going to be used for that purpose. I knew what the arrangement was and that McWhorter was going to take charge of it. It never occurred to me about those different mortgages. That had nothing to do with the deed being made to my daughter instead to me."

Although the plaintiff went on the stand after McWhorter had testified: "the sale to Mrs. Houser was for less than the amount owing to the State and county for taxes. Mr. F. R. Smith knew

that Escoe was in there cutting timber under the lease. I know that because it was discussed between Mr. Smith and myself. He knew that the sale to Mrs. Houser was being made subject to Escoe's rights. That was discussed between Mr. Smith and myself," he did not deny this statement of McWhorter. Escoe testified that after the sale, and on the same day the plaintiff's daughter had bought the land, the plaintiff stated to him: "Yes, my daughter bought it. I was so afraid you were going to overbid me on it." Escoe also testified that the plaintiff further said on that occasion: "All I ask you is to take care of the young timber. You have until the 1st of January." (January 1st being the time Escoe's contract to cut the timber expired.)

The evidence showed the following: the sale of the plaintiff's land for taxes; the plaintiff's subsequent actual knowledge that the county had bought the land under the tax sale to protect itself; that the plaintiff knew the county had sold the timber to Escoe who was cutting it, and that the county had sold Escoe the timber on the land claiming the land only under the tax deed, and Escoe was in possession cutting the timber prior to and at the time the deed was made to his daughter; that the plaintiff participated in the tax sale of the land to his daughter by the county, the consideration of which was less than the taxes due on it, knowing the sale was subject to Escoe's rights, after he had been advised it would be unsafe for him to redeem the land on account of outstanding liens against him. This showed certain component parts of a transaction in which the acts of the plaintiff, the county, Escoe, and the plaintiff's daughter were all so intertwined as to become a part and parcel of the same transaction, and that the plaintiff, at the time he acquiesced in the sale of the land by the county to his daughter, had full knowledge of the whole transaction.

In 21 C. J. 1132, § 133, it is said: "Acts done or knowledge acquired subsequent to the transaction out of which the estoppel is claimed to arise can have no bearing upon the question. The representations or conduct relied on to raise the estoppel must have been concurrent with or anterior to the action which they are alleged to have influenced. *If, however, a party having an interest to prevent an act being done has full notice of its having been done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving*

488

*credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have had if it had been done by his previous license.''* (Italics ours.) In reference to the county's sale to his daughter, it might be well to note the rule laid down by the Supreme Court in *Southern Railway Co.* v. *Hobbs,* supra, as follows: "The testimony of a party who offers himself as a witness in his own behalf is to be construed most strongly against him when it is self-contradictory, vague, or equivocal." Citing *W. & A. R. Co.* v. *Evans, Freyermuth* v. *R. Co., Ray* v. *Green, Farmer* v. *Davenport,* supra. "And he is not entitled to a finding in his favor if that version of his testimony the most unfavorable to him shows that the verdict should be against him." Citing *Southern Bank* v. *Goette,* supra. Even if we concede that the acts of the plaintiff did not change the real title as to him, yet they bar and estop him, on account of his conduct, from contesting the ownership with the county, or Escoe, the county's privy in title, or his daughter, where there was no fraud alleged or proved. *Yarbrough* v. *Seagraves,* 47 *Ga. App.* 436 (170 S. E. 553) ; *Kennedy* v. *Manry,* 6 *Ga. App.* 816 (66 S. E. 29) ; *Mayor &c. of Fort Valley* v. *Levin,* 183 *Ga.* 837, 842, 846 (190 S. E. 14) ; *Southern Manufacturing Co.* v. *R. L. Moss Mfg. Co.,* 13 *Ga. App.* 847 (3) (81 S. E. 263).

There was no error for any of the reasons assigned in admitting the testimony of which the plaintiff complains. Under the principles announced above, the court did not err in directing a verdict in favor of the defendant.

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*