A94A0962. R. T. PATTERSON FUNERAL HOME, INC. et al.
v. HEAD.
(451 SE2d 812)

McMURRAY, Presiding Judge.

Plaintiff William H. Head brought this action seeking to recover damages allegedly sustained as a result of defendants' repudiation of an oral agreement for a three-party like-kind exchange of real estate combined with a sale of corporate stock in exchange of corporate assets. Named as defendants were the corporate entities R. T. Patterson Funeral Home, Inc. ("the Company"), and Patterson-Hartsock, Inc. Also named as defendants were R. T. Patterson, Thomas I. Patterson, Claude E. Hartsock, as well as a non-party to this appeal, each "Individually and in [his or] her corporate capacity." The multiple count complaint alleged fraud, tortious interference with contracts and business opportunities, breach of corporate fiduciary duty, and breach of contract. The complaint also sought punitive damages and OCGA § 13-6-11 expenses of litigation. Defendants answered, denying the existence of an agreement, and further claiming that any oral agreement to transfer real property was unenforceable because it was not in writing as required by OCGA § 13-5-30 (4), the Statute of Frauds.

The case was tried before a jury on theories of fraud and breach of contract. Defendants adduced no witnesses. Viewed in the light to uphold the jury's verdicts, plaintiff's evidence showed the following: The Company "operates [two] funeral homes . . ." in Gwinnett County, Georgia: the Lilburn Chapel and the Norcross Chapel. Since 1977, plaintiff has been a 40 percent shareholder in the Company and "the funeral director in charge of the Lilburn Chapel." Defendant R. T. Patterson owns the remaining 60 percent and is the Company's president. R. T. Patterson also is the sole shareholder of defendant Patterson-Hartsock, Inc., a corporation he formed "to manage real estate[.]" The other individual defendants are relatives of R. T. Patterson and are officers and directors of the Company and Patterson-Hartsock, Inc. R. T. Patterson funded an irrevocable trust which owns the real property where the Company operates the Lilburn and Norcross Chapels. R. T. Patterson "calls the shots on all [three] entities: R. T. Patterson Funeral Home, Inc., Patterson-Hartsock, Inc., and the trust. . . ." If R. T. Patterson "wanted [the trust realty] to be conveyed, it would be conveyed . . . ," even though only his children are the co-trustees.

In February 1990, plaintiff approached R. T. Patterson and expressed an interest in purchasing the Lilburn Chapel portion of the business and the real estate. R. T. Patterson "said at that time that he would sell [plaintiff] the Lilburn Chapel but [that plaintiff] would have to buy [R. T. Patterson] something to exchange. . . . [R. T. Patterson] said he wanted Tim Stewart's funeral home at Duluth, and

[plaintiff], in turn, asked had [R. T. Patterson] spoken with Tim and he had, and [R. T. Patterson gave me a figure [. . . of eight] hundred and fifty thousand dollars ($850,000.00)." Plaintiff thereafter contacted Timothy L. Stewart and "worked an agreement with him whereby [Timothy L. Stewart] could net eight hundred thousand dollars out of the . . . exchange and [plaintiff] would pay in turn all of the legal costs involved with facilitating that agreement."

On April 15, 1990, a meeting of the parties was held, attended by Timothy L. Stewart's tax accountant, Rex A. Millsaps, Sr., and William G. Tanner, Esq., "a neutral, non-biased attorney to handle the paperwork. . . ." There, R. T. Patterson agreed to a sale and exchange of plaintiff's 40 percent interest in the Company in return for the inventory and assets of the Lilburn Chapel as the first step in plaintiff's leaving the Company and establishing his own funeral home. As to the second step in the overall transaction, plaintiff affirmed that "[he], Mr. [R. T.] Patterson and Mr. [Tim] Stewart [orally] reached an agreement where [a] swap of the funeral home would occur [. . . with the] clear understanding that [he was] going to end up with the Lilburn Chapel[.]" The parties stipulated to a value of $800,000 for each of the three properties to be exchanged: The Lilburn Chapel going to plaintiff, Tim Stewart's Duluth funeral home going to R. T. Patterson, and a new funeral home in Winder, Georgia, going to Tim Stewart. The Winder funeral home was to be constructed with the proceeds of a loan plaintiff would be obligated to repay.

The three-way like-kind exchange of properties was intended to qualify for non-recognition of taxable gain pursuant to § 1031 of the Internal Revenue Code. This second step was memorialized in the "Escrow and Exchange Agreement" which R. T. Patterson refused to sign. Plaintiff explained that the Stock Purchase Agreement and the "Escrow and Exchange Agreement" together made one "overall agreement with two dependent parts," and confirmed that, "if there had not been an agreement in [his mind] on the real estate transaction, [he would never have] signed the June 25 [1990] stock purchase agreement." Plaintiff only agreed "to the terms and provisions of the stock purchase agreement in reliance upon the representations of Mr. [R. T.] Patterson and the Patterson group that [he was] going to get the Lilburn Chapel[.]" Defendant R. T. Patterson also affirmed that the written Stock Purchase Agreement (which he did sign) exchanged plaintiff's 40 percent interest in the Company for the bulk of the assets at the Lilburn Chapel, because those assets "were going to stay in the Lilburn Chapel with [plaintiff] once he took ownership. . . ." The stock agreement also contained a provision whereby plaintiff would pay R. T. Patterson approximately $59,000, which sum represented "the difference between the business volume at the [Norcross and

Lilburn] chapels." According to the tax accountant, Mr. Millsaps, the division of Company personal property in the 60 to 40 percent ratio of ownership had to be a separate transaction from the exchange of real property. "It couldn't be done as one transaction and maintain a tax free status, it had to be two separate transactions." Timothy L. Stewart, a party to the like-kind exchange, "left the [April 15, 1990,] meeting at Mr. Millsaps' office, [thinking] the deal was going through. . . . [Stewart] did not hear anything [to the contrary] from either party until [June 28, 1990, when, unbeknownst to plaintiff,] Mr. Thomas [I.] Patterson met [Timothy L. Stewart] and told [him] the [three-way] deal was off." Instead, Thomas I. Patterson made a separate offer to buy Stewart's Duluth funeral home for $500,000. Stewart informed plaintiff of this event.

When plaintiff and defendants met again at 5:00 p.m. on June 30, 1990, apparently to execute the three-way "Escrow and Sales Agreement," Thomas I. Patterson "advised [plaintiff] that they were ready for [him] to sign [his] stock over." Plaintiff declined, "because they had cancelled the real estate exchange with Stewart and [him]self." Thomas I. Patterson informed plaintiff that the Lilburn Chapel was for sale, but insisted for the first time that the price was "one point two million dollars. . . ." As plaintiff left, he reiterated his refusal to perform the stock sale without the transfer of the business. Then, "Thomas [I.] Patterson said, 'Well, you can talk to our attorney.' [Plaintiff's] comment was, 'You know where I will be,' [and Thomas I. Patterson's reply] was, 'You won't be at the funeral home. . . ." Plaintiff "took that to mean that [he] wasn't welcome, that [he] would not be there [. . . so he] had all [his] personal effects [moved] out of the funeral home."

R. T. Patterson confirmed that he "approve[d] and ratif[ied] what Thomas [I. Patterson] said to [plaintiff . . .]" at the June 30, 1990, meeting and that he had earlier authorized and ratified Thomas I. Patterson's approach to Tim Stewart with a separate offer to buy Stewart's Duluth funeral home for $500,000, after plaintiff had signed the stock agreement but before R. T. Patterson signed any real estate agreement or informed plaintiff that he would not go through with the planned like-kind exchange. Other evidence further indicating that R. T. Patterson never intended to follow through with the agreed-upon transfer of the Lilburn Chapel portion of the Company's business but "concocted all this just to get [plaintiff's] stock[,]" was that he had registered and reserved the trade name "Lilburn Chapel" in his own name on April 12, 1990. In "April of 1990," three weeks after Easter Sunday, Thomas I. Patterson began soliciting Stanley Powell to work for the Company to operate "the two chapels that they owned . . . ," which Mr. Powell recognized as the Norcross Chapel and the Lilburn Chapel. Before the 5:00 p.m. meeting of June

30, 1990, defendants had already prepared a notice, also dated June 30, 1990, of a special meeting of the directors and shareholders of the Company, "called for the purpose of removal and election of officers and transactions of other such business. . . ." The next day, July 1, 1990, "[t]hey fired [plaintiff's] son-in-law." Also on July 1, 1990, R. T. Patterson wrote to the Company notifying it that "it has become necessary to increase the monthly rental amounts for the two funeral homes . . . [in the total amount of $10,000 per month, . . . effective] August 1, 1990."

In support of his contention that his part performance rendered the oral agreement enforceable pursuant to OCGA § 13-5-31 (3), plaintiff showed that he was prepared to tender his shares concurrently with the real estate exchange, that he negotiated a loan commitment from the Bank of Gwinnett County via the Small Business Administration for $876,400 using "legal descriptions of the cemetery and the funeral home property . . ." furnished to him for that purpose by R. T. Patterson; and that a survey and an appraisal of the Lilburn property were performed to get the loan approved. Plaintiff performed those "Conditions As To Closing" itemized in the Stock Purchase Agreement, such as paying for "supplies, inventory and other items that have been ordered for the Lilburn Chapel under the R. T. Patterson Funeral Home, Inc. account. . . ." He "cease[d] using any accounts of [R. T. Patterson Funeral Home, Inc.]" and arranged for a different telephone number to be installed at the Lilburn Chapel. However, R. T. Patterson's son "Thomas told the telephone company not to install [plaintiff's] number. . . ."

The jury returned a special verdict for plaintiff against specified defendants for both breach of contract and for fraud. The jury awarded no punitive damages but did award the expenses of litigation. The damages awarded for breach of contract are identical to those awarded for fraud, namely one year's lost profits from the scuttled deal. After the entry of judgment, defendants moved for judgment n.o.v. The trial court denied the motion and this appeal followed. In five related enumerations, defendants complain of the denial of their collective motion for judgment n.o.v. *Held*:

1. In their first enumeration, defendants contend the trial court erred in denying their motion for summary judgment and their motion for directed verdict as to Count 1 of the complaint, alleging fraud.

(a) Once a case has been submitted to the jury and a judgment rendered on its verdict, the denial of a summary judgment motion is a moot issue. *White v. Lance H. Herndon, Inc.*, 203 Ga. App. 580 (1) (417 SE2d 383).

(b) "If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions there-

from, shall demand a particular verdict, such verdict shall be directed." OCGA § 9-11-50 (a). Plaintiff's claim of fraud is supported by the evidence showing that R. T. Patterson falsely promised to exchange the Lilburn Chapel, including the realty, for plaintiff's 40 percent interest in the Company, knowing that he never intended to keep that promise. Instead, R. T. Patterson attempted to obtain Timothy L. Stewart's Duluth property for himself while depressing the value of plaintiff's 40 percent interest in the Company, in that he artificially inflated Company expenses by unilaterally increasing the rent the Company must pay to the real estate management company he controlled, Patterson-Hartsock, Inc. "Concealment per se amounts to actual fraud when from any reason one party has a right to expect full communication of the facts from another." *Morris v. Johnstone*, 172 Ga. 598, 605 (158 SE 308). Defendants contend the trial court erred in denying their motion for directed verdict, arguing that, since the oral agreement for the transfer of an interest in land is unenforceable at the outset, there can be no reasonable detrimental reliance upon such a promise. See *Adamson v. Maddox*, 111 Ga. App. 533, 535 (3) (142 SE2d 313). Specifically, they argue on appeal that plaintiff's part performance were merely acts "in preparation of the transaction, not in furtherance of it [or] essential to it [. . . and, in] a real estate transaction, the cases hold that only possession of the land itself can amount to the requisite partial performance described in OCGA § 13-5-31."

OCGA § 13-5-31 (3) provides: "The provisions of Code Section 13-5-30[, the Statute of Frauds,] do not extend to . . . cases: . . . [w]here there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the court did not compel a performance." This language is to be contrasted with that of OCGA § 23-2-131: "The specific performance of a parol contract as to land shall be decreed if the defendant admits the contract or if the contract has been so far executed by the party seeking relief and at the instance or by the inducements of the other party that if the contract were abandoned he could not be restored to his former position. . . . Full payment alone accepted by the vendor, or partial payment accompanied by possession, or possession alone with valuable improvements, if clearly proved in each case to have been done with reference to the parol contract, shall be sufficient part performance to justify a decree."

"It is contended by the defendant[s] that the contract is not taken out of the statute of frauds for the reason that the plaintiff was not in possession of the property. As we understand the law, this rule applies to cases in equity for specific performance or damages in lieu thereof, and not to actions at law for damages for breach of contract. Code [Ann.] § 37-802 [now 23-2-131 (b)], applies only to actions for

specific performance or damages in lieu thereof, in equity. . . . See *McLeod v. Hendry*, 126 Ga. 167 (54 SE 949); *Woodall v. Williams*, 176 Ga. 343 (167 SE 886)." *Moore v. Deal*, 75 Ga. App. 823, 827 (4), 828 (44 SE2d 571). See also *Warren v. Camp*, 232 Ga. 681, 682 (1) (208 SE2d 489); *Taylor v. Cureton*, 196 Ga. 28 (2) (25 SE2d 815). In the case sub judice, plaintiff did not seek the equitable remedy of specific performance nor damages in lieu of title to the Lilburn real property, valued at either $800,000 or $1,200,000. Rather, plaintiff sought only money damages and only for one year's anticipated profit, traveling under theories of fraud and breach of contract. Consequently, the fact that plaintiff never had exclusive possession of the Lilburn Chapel (after being essentially ousted by Thomas I. Patterson and fired by the board of directors) does not demonstrate that his actions were, as a matter of law, insufficient partial performance within the purview of OCGA § 13-5-31 (3). The trial court did not err in failing to direct a verdict as to plaintiff's claim of fraud on this ground.

Nevertheless, defendants urge that the acts plaintiff performed were merely "in preparation of the transaction, not in furtherance of it, essential to it, or beneficial to [defendants], and therefore, [are not] sufficient performance of the alleged agreement to remove it from the Statute of Frauds."

"The part performance referred to in the Code, § 20-402 (3) [now OCGA § 13-5-31 (3)], as forming an exception to the requirements of § 20-401 [now OCGA § 13-5-30], means part performance of the contract. The doing of an independent thing, even though the act would not have been done but for the contract, is not sufficient." *Smith v. Davidson*, 198 Ga. 231, 232 (3) (31 SE2d 477). "[T]he part performance shown must be consistent with the presence of a contract and inconsistent with the lack of a contract." *Hudson v. Venture Industries*, 243 Ga. 116, 118 (252 SE2d 606). In the case sub judice, proof that plaintiff obtained a business license in the name of Bill Head Funeral Home, Inc. and paid to have business cards and stationery printed is proof only of acts done in anticipation of a contract, and so are not proof of plaintiff's partial performance as contemplated by that contract. See, e.g., *Cofer v. Wofford Oil Co. of Ga.*, 85 Ga. App. 444, 449 (3) (69 SE2d 674). However, having secured the commitment of Tim Stewart as demanded by R. T. Patterson, plaintiff's subsequent acts in paying for the survey and appraisal, and in negotiating the successful loan application, all were essential to the three-way like-kind exchange and in performance of plaintiff's obligations thereunder. Moreover, plaintiff's performance of the "Conditions As To Closing" are consistent with the existence of an overarching contract for the exchange of real estate in conjunction with the sale of Company stock in exchange for the Lilburn Chapel inventory and assets

and are inconsistent with the lack of such a contract. Otherwise, the stock purchase agreement made no sense without a place for plaintiff to run his business, and there is no contention that defendants intended to lease the property to plaintiff as a competitor. The existence of facts authorizing an exception to the requirement of a writing as provided by OCGA § 13-5-31 (3) need only "be established by a preponderance of the evidence." *Tidwell v. Garrick*, 149 Ga. 290, 291 (2) (a) (99 SE 872). The evidence of partial performance in the case sub judice is sufficient to create a jury question whether the oral agreement to transfer an interest in land is enforceable pursuant to OCGA § 13-5-31 (3). Furthermore, that evidence of part performance is sufficient to distinguish the case sub judice from *Adamson v. Maddox*, 111 Ga. App. 533, 535 (3), 536, supra, and from the general rule that there is no justifiable reliance upon future promises which must be in writing to be enforceable. "The doing of the contemplated act furnishes the consideration [and mutuality] for the original agreement, even though such agreement at its inception was nudum pactum. [Cits.]" *Wilson v. Whitmire*, 212 Ga. 287, 290 (92 SE2d 20). Although plaintiff in the case sub judice never tendered complete performance, that is not required under the express terms of OCGA § 13-5-31 (3). "If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." OCGA § 13-4-23. R. T. Patterson's refusal to fulfill the three-way like-kind exchange rendered any further performance futile. Since there is "some evidence of . . . part performance sufficient to take the oral contract out of the [S]tatute of [F]rauds, the trial court did not err in denying [defendants'] motion [for a directed verdict] on [the] issue [of fraud]. See *Rose v. O'Brien*, 191 Ga. App. 36 (2) (380 SE2d 730) (1989)." *Haehn v. Alheit*, 212 Ga. App. 252, 254 (3) (441 SE2d 529).

2. Defendants' second enumeration, complaining of the denial of a directed verdict with respect to plaintiff's claim sounding in breach of contract, has been considered and is found to have been rendered moot by our disposition in Division 1.

3. Next, defendants contend the trial court erred in submitting the issue of lost profits to the jury, arguing that plaintiff's evidence was "too speculative and remote to be admissible."

"It is not the rule in this State that all profits are too remote and speculative to be recoverable." *Atlanta Gas Light Co. v. Newman*, 88 Ga. App. 252, 253 (2), 254 (76 SE2d 536). " 'It may be stated as a general rule that in tort actions a recovery may be had for loss of profits, provided their loss is the proximate result of the defendant's wrong[,] and they can be shown with reasonable certainty. The profits recoverable in such cases are limited to probable, as distinguished from possible benefits. . . .' [Cit.]" *Norris v. Pig'n Whistle Sandwich*

*Shop*, 79 Ga. App. 369, 372 (1), 373 (53 SE2d 718). In the case sub judice, plaintiff's evidence of anticipated profits was an extrapolation from the Company's history of actual profits, achieved as an established business under plaintiff's direction. This was an adequate evidentiary foundation for the jury's award. *Atlanta Gas Light Co. v. Newman*, 88 Ga. App. 252, 253 (2), supra.

4. In their fourth enumeration, defendants Patterson-Hartsock, Inc., R. T. Patterson, Claude E. Hartsock, and Thomas I. Patterson, contend the trial court erred in denying their motion for directed verdict. They first argue that the "only evidence that R. T. Patterson was personally liable for fraud or breach of contract was his [own] testimony that he 'called the shots' in the corporation and the trust [which owned the real property at issue]." However, the evidence was sufficient to authorize the conclusion that R. T. Patterson personally engaged in a campaign to relieve plaintiff of the value of his interest in the Company by fraudulently promising to trade the Lilburn Chapel land and business, with the present intent never to fulfill that promise.

Next, defendants Thomas I. Patterson, Claude E. Hartsock, and Patterson-Hartsock, Inc. argue that "[t]here was no evidence that any of the [Defendants] acted in such a manner as to expose themselves to personal liability. The only claimed evidence was that they failed to notify [Plaintiff] that there was no agreement. . . ."

Thomas I. Patterson participated in the ongoing deception by surreptitiously negotiating directly with Timothy L. Stewart at the direction of R. T. Patterson, after the three-way like-kind exchange agreement already had been reached. The trial court did not err in refusing to direct the verdict as to him. However, with respect to Claude E. Hartsock and the real estate management company Patterson-Hartsock, Inc., there is no evidence of participation in or perpetuation of the fraudulent promise to trade the Lilburn Chapel land along with the business, in exchange for cash and plaintiff's shares in the Company. Moreover, Claude E. Hartsock and Patterson-Hartsock, Inc. are not parties to the oral agreement and could not be liable for any breach thereof. Consequently, the trial court erred in failing to direct the verdict as to them.

5. Lastly, defendants enumerate the denial of their motion for directed verdict as to plaintiff's claim for OCGA § 13-6-11 attorney fees, arguing that counsel "failed to apportion his time between the six counts of his Complaint," relying on *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401 (433 SE2d 606).

Plaintiff's counsel expressly excluded from the calculation of time spent on the case those "attorney's fees for the defense of [a] counterclaim [defendants had] filed." He further testified to the reasonableness of the fee in light of the experience and abilities of the lawyers

involved and considering the area of practice. The jury awarded $25,102 as OCGA § 13-6-11 expenses of litigation in addition to compensatory damages in tort (and in contract) of $99,244. Of this $25,102, "twenty-three thousand six hundred seventy-eight dollars and fifty cents ($23,678.50) . . ." represented attorney fees.

"The question of attorney fees under OCGA § 13-6-11 is a question for the jury. *Brannon Enterprises v. Deaton,* 159 Ga. App. 685 (285 SE2d 58) (1981). The standard of review of an award of attorney fees under OCGA § 13-6-11 is whether there is any evidence to support the award. *Fuller v. Moister,* 248 Ga. 287 (282 SE2d 889) (1981)." *Spring Lake Property Owners Assn. v. Peacock,* 260 Ga. 80, 81 (390 SE2d 31). Inasmuch as defendants Claude E. Hartsock and Patterson-Hartsock, Inc. are not liable to plaintiff for compensatory damages under either theory submitted to the jury, they cannot be held liable for OCGA § 13-6-11 attorney fees and expenses of litigation. See *Russell Corp. v. BancBoston Fin. Co.,* 209 Ga. App. 660, 663 (6) (434 SE2d 716).

With respect to defendants R. T. Patterson and Thomas I. Patterson, "[d]espite the existence of a bona fide controversy as to liability, [the] jury [in the case sub judice was authorized to] find that defendant[s] 'acted in the most atrocious bad faith in . . . dealing with the plaintiff.' *Powell v. Watson,* 190 Ga. App. 375, 376 (378 SE2d 867) (1989). See also *Ga.-Carolina Brick &c. Co. v. Brown,* 153 Ga. App. 747, 750 (2) (B) (266 SE2d 531) (1980)." *Fidelity Nat. Bank v. Kneller,* 194 Ga. App. 55, 62 (3), 63 (390 SE2d 55). This would authorize an award of OCGA § 13-6-11 expenses of litigation, including such attorney fees, but only such attorney fees as are attributable "solely to the prevailing claim. . . ." *Southern Cellular Telecom v. Banks,* 209 Ga. App. 401, 402, supra. Accordingly, the trial court did not err in denying the motion for directed verdict insofar as the motion failed to distinguish between liability vel non and the quantum of damages.

Although defendants chose not to cross-examine counsel about whether he could distinguish time spent on viable theories of liability as opposed to unsuccessful, unpersuasive, or unsupported theories, verdicts were directed as to theories of liability in tortious interference and breach of corporate fiduciary duty, and as to one party on all theories. Accordingly, this award of OCGA § 13-6-11 attorney fees must be reversed in part "and the case remanded for an evidentiary hearing to establish the amount of attorney fees attributable to [plaintiff's prevailing claims]. See *Southern Cellular Telecom v. Banks,* 209 Ga. App. 401, 402, supra." *Mitcham v. Blalock,* 214 Ga. App. 29, 31 (2), 33 (447 SE2d 83).

6. As to defendants Claude E. Hartsock and Patterson-Hartsock, Inc. the judgment is reversed in its entirety with direction to enter judgment in accordance with their motions for directed verdict.

OCGA § 9-11-50 (e). As to defendants R. T. Patterson and Thomas I. Patterson, the judgment awarding compensatory damages in tort is affirmed. The judgment awarding OCGA § 13-6-11 attorney fees as expenses of litigation is affirmed as to liability, reversed in part as to the amount of damages, and remanded for an evidentiary hearing.

*Judgment affirmed in part, reversed in part, and remanded with direction. Pope, C. J., and Smith, J., concur in the judgment only.*

DECIDED DECEMBER 1, 1994 —
RECONSIDERATION DENIED DECEMBER 13, 1994 —

*Deming, Deming, Born & Parker, Paul M. Hoffman,* for appellants.

*Andersen, Davidson & Tate, Gerald Davidson, Jr., Larry C. Oldham,* for appellee.