A97A1386, A97A1387. INSURANCE COMPANY OF NORTH AMERICA v. ALLGOOD ELECTRIC COMPANY, INC.; and vice versa.
(494 SE2d 728)

BEASLEY, Judge.

These two appeals are from portions of the trial court's judgment on a motion for j.n.o.v.

Insurance Company of North America, the prime contractor's surety on a state-owned construction project, appeals from the denial of its j.n.o.v. motion awarding a second-tier electrical subcontractor, Allgood Electric Company, Inc., benefits under the prime contractor's statutory payment bond. See OCGA § 13-10-1 (b) (2) (A). We affirm the judgment against the surety because there is proof authorizing the jury's finding that Allgood is entitled to benefits under the payment bond for the unpaid balance of its lump-sum subcontract with the prime contractor's security system contractor, Micro Manage-

ment Associates, Inc.

Allgood cross-appeals from that part of the same judgment entered in favor of the surety notwithstanding a jury's verdict awarding Allgood attorney fees and expenses of litigation under OCGA § 13-6-11.

We reverse the ruling because Allgood's proof that the surety refused to negotiate its pre-suit claim under the payment bond authorized the jury's finding that the surety acted in bad faith in dealing with Allgood and because competent evidence supported the amount of the award.

The State of Georgia contracted with Ray Bell Construction Company ("Ray Bell") to build a prison in Wilcox County, Georgia, and Ray Bell contracted with Micro to install the prison's security system. Micro then subcontracted with Allgood to wire the security system. According to this subcontract's "FINAL PAYMENT" provision, Micro agreed to pay Allgood $350,500 when the wiring was complete, less any advances paid under the subcontract's "PROGRESS PAYMENTS" provision giving Allgood the right to apply for monthly progress payments for "the value of the Work completed" during performance.

After receiving two progress payments from Micro for work performed in June and July 1990, Allgood received three consecutive progress payments in August, September and October 1990. Allgood received these payments via checks from Ray Bell payable to Micro and Allgood for sums exceeding the amount of work performed by Allgood. Allgood endorsed the checks, but retained only proceeds reflecting payment for work it had performed. Allgood paid the residual to Micro.

Allgood submitted a $65,926.65 progress payment request, dated November 19, 1991, certifying anticipated payment advances, plus retainer, for about 99 percent of the work under its subcontract with Micro. This request was not honored. Allgood instead accepted a joint check from Ray Bell payable to Micro and Allgood for $34,208.60. Allgood endorsed this check, kept the proceeds and continued work. About a month later, Allgood executed a document entitled, "SUBCONTRACT/PURCHASE ORDER RECEIPT AFFIDAVIT AND PARTIAL LIEN WAIVER," certifying payment advances totaling $240,448.88 (about 69 percent of the $350,500 contract price) and releasing "all claims arising out of said subcontract and the project through December 1991 . . . , including but [not] limited to claims representing mechanics liens."

Although Allgood submitted progress payment requests for December 1990 and January, February, March and April 1991, Allgood did not receive another payment until May 1991. Allgood thereafter continued work, but received only four more progress pay-

ments. Because these payments did not cover Allgood's outstanding payment requests, Allgood notified the surety of its claim in a letter dated April 30, 1992. The surety responded in a letter dated June 4, 1992, advising Allgood that the matter was under investigation. Allgood thereafter continued work and completed the job in July 1992.

Micro went out of business, and Ray Bell's attorney posted a letter to Allgood's president accusing Allgood of shoddy work. This attorney informed Allgood that "[i]t is Ray Bell's position that Allgood has been paid all monies which are due to it at this time." When the surety failed to respond to Allgood's claim for almost a year, Allgood filed an action against Micro, Ray Bell and the surety in Fulton County Superior Court on April 20, 1994, seeking recovery for the remaining $87,543.80 balance under its contract with Micro. Allgood also sought over $100,000 worth of extra work it allegedly performed for Ray Bell and requested attorney fees and expenses of litigation pursuant to OCGA § 13-6-11.

Allgood later abandoned its action against Micro and Ray Bell and proceeded solely against the surety. Ray Bell remained in the suit and pressed a counterclaim against Allgood for allegedly performing substandard work. After a trial, a jury awarded Allgood the entire unpaid balance of its contract with Micro, $87,543.80, and granted Allgood $48,276.21 in attorney fees and expenses of litigation under OCGA § 13-6-11. The jury did not accept Allgood's claim for extra work and rejected Ray Bell's claim against Allgood for substandard performance.

*Case No. A97A1386*

1. The surety contends the trial court erred in denying its motion for j.n.o.v., arguing that Allgood's November 19, 1991 progress payment request certifying completion of about ninety-nine percent of the job, along with Allgood's execution of the partial lien waiver a month later, demands a judgment for Allgood for no more than the subcontract's ten percent retainer plus one percent of the work which Allgood did not certify as complete in its November 1991 progress payment request, i.e., $37,013.50. The surety also contends the jury should have given it credit for the total balance of the three joint progress payment checks Ray Bell tendered to Micro and Allgood for work which Allgood and Micro completed in August, September and October 1990. These assertions are without merit.

Nothing in Allgood's November 1991 payment certification or the December 1991 partial lien waiver diminished Micro's promise to pay Allgood $350,500 when the wiring job was complete. Further, we find no authority authorizing a subcontractor to unilaterally retain proceeds of a joint check for work which the subcontractor has not per-

formed. Saying so would sanction theft, which we refuse to do. Accordingly, since it is undisputed that Allgood kept only money from the joint checks that it had earned and then gave the rest to Micro, and since there is proof that Allgood competently completed its work in July 1992, the jury's verdict awarding Allgood the unpaid balance of its lump-sum contract with Micro was authorized. The trial court did not err in denying the surety's motion for j.n.o.v. with regard to Allgood's claim for payment under Ray Bell's payment bond. See *Beasley v. Paul*, 223 Ga. App. 706 (1) (478 SE2d 899) (1996).

2. The surety's second enumeration of error challenging the admission of testimony regarding Allgood's reason for executing the partial lien waiver in December 1991 provides no basis for reversal. Any such testimony admitted is harmless since the partial lien waiver does not evidence an agreement relinquishing Allgood's right to recover the full benefit of its lump-sum performance contract with Micro.

### Case No. A97A1387

3. We agree with Allgood that the trial court erred in granting a judgment in favor of the surety notwithstanding the jury's verdict awarding Allgood attorney fees and expenses of litigation under OCGA § 13-6-11.

" 'A judgment n.o.v. is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is no error to deny the motion. (Cits.)' *Stone v. Cook*, 190 Ga. App. 11, 12 (1) (378 SE2d 142) (1989)." *Ga. Ports Auth. v. Southeast Atlantic Cargo &c.*, 202 Ga. App. 318, 324 (3) (414 SE2d 232) (1991).

"A trial judge cannot grant motions for directed verdict or j.n.o.v. on any issue if 'any evidence' exists to support that issue. See *Grubb v. Woodglenn Properties*, 220 Ga. App. 902, 903 (470 SE2d 455) (1996)." *Beasley v. Paul*, 223 Ga. App. at 707 (1).

(a) *OCGA § 13-6-11 Liability*. The trial court granted the surety's motion for j.n.o.v. as to Allgood's claim under OCGA § 13-6-11 because Allgood's attorney could not testify and segregate, with any degree of certainty, time and expenses attributable to Allgood's successful breach of contract claim from time and expenses attributable to Allgood's unsuccessful extra-work claims. (Nor could this attorney say how much time was necessary to defend Ray Bell's counterclaim.) Quoting *Arford v. Blalock*, 199 Ga. App. 434, 439 (10) (405 SE2d 698) (1991), the trial court specifically reasoned that such vague testimony defeated the jury's attorney fees and litigation expenses award

because "[n]o evidence was presented from which the jury could determine what portion of the total amount of attorney time and litigation expenses incurred in this multi-count, multi-defendant litigation was attributable to the particular claim. . . . "

We find this logic misplaced because, notwithstanding the success or validity of Allgood's unsuccessful claims or Ray Bell's counterclaim, Allgood tendered proof that the surety engaged in "wanton and excessive indulgence in litigation" by refusing, in bad faith, to investigate, negotiate or discuss any claim, set-off or defense with Allgood between the time Allgood posted its April 30, 1992 claim letter and the time Allgood initiated suit in Fulton County on April 20, 1994.[1] Such circumstances not only distinguish this case from the rule set out in *Arford v. Blalock*, 199 Ga. App. 434, 439 (10), supra, but also removes it from the rule in *Lineberger v. Williams*, 195 Ga. App. 186, 188 (3) (393 SE2d 23) (1990) (that recovery is not possible under OCGA § 13-6-11 for attorney fees and expenses incurred for defending a claim). Had the surety aspired to negotiate or simply communicate with Allgood before forcing litigation, alternative dispute resolution would have provided a chance for avoiding this protracted and expensive lawsuit.

Just as in *Buffalo Cab Co. v. Williams*, 126 Ga. App. 522 (191 SE2d 317) (1972), and *Western &c. R. Co. v. Smith*, 15 Ga. App. 289 (82 SE 906) (1914), the surety's "so sue me" gamble authorized an OCGA § 13-6-11 award for all of Allgood's attorney fees and expenses of litigation. See *Tift v. Towns*, 63 Ga. 237, 242 (3) (1879); and Presiding Justice now Chief Justice Robert Benham's special concurrence in *Latham v. Faulk*, 265 Ga. 107, 108-109 (454 SE2d 136) (1995). See also *Crocker v. Stevens*, 210 Ga. App. 231, 238 (8) (435 SE2d 690) (1993).

(b) *Allgood's Proof of Attorney Fees and Litigation Expenses*. Gloria A. Alday, Allgood's president, testified about work which was billed as performed by Allgood's trial attorney and at least six other individuals — two named lawyers, an unnamed associate attorney, two or more unnamed paralegals and "Walker Hulbert." Billing records were used by the witness to refresh her recollection of the invoices received and which she was responsible for reviewing and paying. Allgood's president knew personally some of the precise bases for the fees because she was involved in the preparation for trial three times and for settlement talks, and she knew of the motions and responses required for the litigation. She considered the fees reasonable and comparable to fees the company incurred from other

---

[1] Allgood originally filed suit in Wilcox County on April 1, 1993, but withdrew this action because the surety contested venue.

attorneys in the past and in accord with her investigation of fees charged by others.

Allgood's trial attorney then testified and expressed opinion that Alday's account of the attorneys' billings was necessary and reasonable. The plaintiff's attorney himself is competent to testify as to his opinion on reasonable fees, which he did. *Bankers Health &c. Ins. Co. v. Plumer*, 67 Ga. App. 720, 727 (2) (21 SE2d 515) (1942); *First Bank of Clayton County v. Dollar*, 159 Ga. App. 815, 817 (4) (285 SE2d 203) (1981). He testified as to the rates of the various people who worked on the case, his background and rationale for the rates, his familiarity with the litigation history, the type of work which was done, and the reasonableness of it and of the fees charged. He was cross-examined to the extent defendant desired.

Both witnesses gave the same figure for the total amount of Allgood's attorney fees and litigation expenses, an amount which mirrors the jury's $48,276.21 verdict.

Competent evidence supported that verdict, not only as to the substantive ground but also as to the reasonableness of the amount awarded by the jury.

*Judgment affirmed in Case No. A97A1386. Judgment reversed in Case No. A97A1387. Andrews, C. J., Birdsong, P. J., Pope, P. J., and Johnson, J., concur. Smith, J., concurs in the judgment only. McMurray, P. J., and Eldridge, J., concur in part and dissent in part. Blackburn and Ruffin, JJ., not participating.*

McMurray, Presiding Judge, concurring in part and dissenting in part.

I fully concur as to Divisions 1, 2 and 3 (a) of the majority opinion, but respectfully dissent with regard to Division 3 (b) because, in my view, the trial transcript reveals that all but Allgood's trial attorney's testimony regarding the work he performed constitutes hearsay, "and hearsay, even when admitted into evidence without objection, lacks probative value to establish any fact. *Howell Mill/Collier Assoc. v. Pennypacker's*, 194 Ga. App. 169, 171 (2) (390 SE2d 257)." *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2), 32 (447 SE2d 83), cert. denied at 214 Ga. App. 906. This is not to say, however, that I believe the deficiency in Allgood's proof of damages completely defeats the jury's verdict. As in *Southern Co. v. Hamburg*, 220 Ga. App. 834, 842 (5) (470 SE2d 467); *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2), supra, and *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402 (433 SE2d 606), I believe the unauthorized jury verdict in the case sub judice may be cured upon reversal in the cross-appeal (Case No. A97A1387) and remand of the case " 'for [a new trial] to establish the amount of attorney fees attributable to (probative evidence offered at [trial]). See *Southern Cellular Telecom v. Banks*, [supra]."

*Mitcham v. Blalock*, [supra].' *R. T. Patterson Funeral Home v. Head*, 215 Ga. App. 578, 585 (5), 586 (451 SE2d 812). See *City of College Park v. Pichon*, 217 Ga. App. 53, 55 (4) (456 SE2d 686)." *Southern Co. v. Hamburg*, 220 Ga. App. 834, 842 (5), supra. See *Pure Oil Co. v. Dukes*, 107 Ga. App. 326, 327 (3), 328 (130 SE2d 234). With this view in mind, and since it appears from the trial transcript that Gloria A. Alday testified not from her own recollection but almost exclusively from Allgood's attorney's billing sheets, I find it appropriate to clarify confusion arising from this Court's holdings in *Santora v. American Combustion*, 225 Ga. App. 771, 774 (3), 775-776 (485 SE2d 34), and *N.D.T., Inc. v. Connor*, 196 Ga. App. 314, 315 (6), 316 (395 SE2d 901), regarding the admissibility of attorney billing sheets under Georgia's Business Records exception to the hearsay rule, OCGA § 24-3-14. Compare *Oden v. Legacy Ford-Mercury*, 222 Ga. App. 666, 669 (3) (476 SE2d 43).

(a) *Allgood's Proof of Attorney Fees and Litigation Expenses.* Gloria A. Alday, Allgood's president, testified (apparently from attorney billing invoices) about work which was purportedly performed by Allgood's trial attorney and at least six other individuals — two named lawyers, an unnamed associate attorney, two or more unnamed paralegals and "Walker Hulbert." Allgood's trial attorney then testified, relying on Alday's testimony and opining that her account of Allgood's attorneys' billings was necessary and reasonable. Both witnesses gave the same figure for the total amount of Allgood's attorney fees and litigation expenses, an amount which mirrors the jury's $48,276.21 verdict. I believe that the problem with this award is that all but Allgood's attorney's testimony regarding the work he performed himself constitutes hearsay, "and hearsay, even when admitted into evidence without objection, lacks probative value to establish any fact. *Howell Mill/Collier Assoc. v. Pennypacker's*, [supra]." *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2), 32, supra.

Hearsay evidence is defined as "that which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons." OCGA § 24-3-1 (a). While this definition encompasses many classes of proof, *it is fundamental that testimonial hearsay follows when a witness speaks to the truth of something outside the scope of his or her personal knowledge.* Green, Ga. Law of Evidence (4th ed.), § 217; 5 Wigmore, Evidence, § 1361 (Chadbourn rev. 1974). An examination of Gloria A. Alday's attorney fees testimony and Allgood's trial attorney's attorney fees testimony in the case sub judice, which I am compelled to include as appendices to this dissent, reveals that the witnesses possess no personal knowledge of the work which was reportedly performed by six or more individuals who represented Allgood but who did not appear or offer testimony at trial. And this deficiency, in my view, is not bolstered by

the majority's observation that "Allgood's president knew personally some of the precise bases for the fees because she was involved in the preparation for trial three times and for settlement talks, and she knew of the motions and responses required for the litigation." I simply do not think (as does the majority) that Alday's general observations of some of Allgood's attorneys' activities reveal her "personal knowledge" of the specific work which was reported to her in Allgood's attorneys' billing records.

I do not believe that the deficiencies in Allgood's proof of damages completely defeat the jury's verdict. As in *Southern Co. v. Hamburg*, 220 Ga. App. 834, 842 (5), supra; *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2), supra; and *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402, supra, the unauthorized jury verdict in the case sub judice may be cured upon reversal in the cross-appeal (Case No. A97A1387) and remand of the case " 'for [a new trial] to establish the amount of attorney fees attributable to (probative evidence offered at [trial]). See *Southern Cellular Telecom v. Banks*, [supra]." *Mitcham v. Blalock*, [supra].' *R. T. Patterson Funeral Home v. Head*, [supra]. See *City of College Park v. Pichon*, [supra]." *Southern Co. v. Hamburg*, 220 Ga. App. 834, 842 (5), supra. See *Pure Oil Co. v. Dukes*, 107 Ga. App. 326, 327 (3), 328, supra, holding that where the plaintiff's proof does not support a verdict in the amount found by the jury, but authorizes a verdict for some amount in the plaintiff's favor, the remedy is a new trial.

(b) *Georgia's Business Records Exception.* Since no billing records were introduced in the case sub judice, I recognize that this Court is without judicial power to resolve questions raised by *Santora v. American Combustion*, 225 Ga. App. 771, 774 (3), 775-776, supra, and *N.D.T., Inc. v. Connor*, 196 Ga. App. 314, 315 (6), 316, supra, regarding the admissibility of attorney billing sheets under Georgia's Business Records Exception to the hearsay rule, OCGA § 24-3-14. Compare *Oden v. Legacy Ford-Mercury*, 222 Ga. App. 666, 669 (3), supra. But because Gloria A. Alday apparently testified relying on such records, I find it appropriate to clarify that Georgia's Business Records Exception is not a rule subject to indifferent statutory application, but is a venerable exception ascending from principles of necessity and trustworthiness. *Fielder, Bros. & Co. v. Collier*, 13 Ga. 496, 499. See OCGA § 24-3-1's requirement that "[h]earsay evidence is admitted only in specified cases from necessity." OCGA § 24-3-1 (b). Also see 5 Wigmore, Evidence, §§ 1517-1561 (Chadbourn rev. 1974).

In *Fielder*, a case involving proof of a volume of cotton shipped from Apalachicola, Florida, to Liverpool, England, Chief Justice Joseph H. Lumpkin (writing for the court) reasoned that a large factorage and commission house's shipping records, while hearsay, were nonetheless the best evidence of the transaction, when kept in the

regular course of business, because it would have been impractical and unreasonable to expect "[t]he weighers, wharfingers, and numerous subordinates who handled this cotton [to recall] the multitude of transactions thus occurring every day." Id. at 499. The court also reasoned that the fiduciary relationship between the shipping agent and the defendant rendered the shipping records trustworthy. Id. at 500. Similar logic does not apply in the case sub judice.

Allgood's lawyers are neither disinterested recording agents, nor clerks, "weighers," or "wharfingers." They are but several attorneys who performed professional services for Allgood while — at the same time — expected payment for these services from the surety under Allgood's claim for attorney fees and litigation expenses. Under such circumstances, I find no reason of necessity which relieved these lawyers of their duty to answer, before the jury, for the specific billings Gloria A. Alday proffered for recovery under OCGA § 13-6-11. Accordingly, I would adhere to the principle initially recognized in *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402, supra, that possible deficiencies, suppressions and sources of error which may lie within attorney billing records are tested best by confrontation and cross-examination. It thus appears elemental to me that recording legal services is not merely a matter of mechanical routine which, alone, establishes the indicia of reliability required for admission of records under Georgia's Business Records Exception. The recording of time and expenses by an opposing party's agent or legal representative, in my view, necessarily involves an account of judgment which, when embraced in a business memorandum, is not admissible under OCGA § 24-3-14. See *Wesley v. State*, 225 Ga. 22, 23 (2) (165 SE2d 719); *Knudsen v. Duffee-Freeman, Inc.*, 95 Ga. App. 872, 875 (2), 879-881 (99 SE2d 370). I therefore believe that Georgia's Business Records Statute, as suggested in *Santora v. American Combustion*, 225 Ga. App. 771, 774 (3), 775-776, supra, and *N.D.T., Inc. v. Connor*, 196 Ga. App. 314, 315 (6), 316, supra, must "not go to the extent of rendering admissible self-serving memorandums of [the] kind [described by Gloria A. Alday in the case sub judice]. *Young v. Landers*, 31 Ga. App. 59 (119 SE 464). A contrary ruling would render admissible files of correspondence and all kinds of writings if made by one in connection with the operation of a business." *Maryfield Plantation v. Harris Gin Co.*, 116 Ga. App. 744, 747 (4) (159 SE2d 125).

I am authorized to state that Judge Eldridge joins in this opinion.

## ALLGOOD'S TRIAL ATTORNEY'S
## ATTORNEY FEES TESTIMONY

"THE COURT: Mr. Crewdson, [Allgood's trial attorney] tell the jury how you arrived at your attorney's fees, will you, please? MR. CREWDSON: The attorney's fees in this case, Ms. Alday previously testified to you the number of hours that have been charged to her by the various lawyers in this case. Mr. Hughes' rate in this particular matter was two hundred twenty-five dollars per hour. My rate was one hundred ninety-five dollars per hour. Mr. Christy's rate was one hundred dollars per hour. There was some additional paralegal time in getting the paperwork together. I believe our time was billed for that at forty-five an hour; Mr. Christy's paralegal at fifty an hour. I have been in the practice of construction law for eight years. I have handled payment bond claims on — as the plaintiff and as the defendant, and I have done that over the eight-year period in Atlanta for two different law firms practicing construction law. In my opinion and in my experience, the rates of two twenty-five per hour for Mr. Hughes at his experience level, one ninety-five per hour at my experience level, and one hundred dollars per hour for Mr. Christy's experience level are comparable and competitive in the Atlanta market, and in Mr. Christy's for Mr. Christy's level of experience, as well, since he's not from Atlanta. I find that those rates are reasonable. Based on my experience, I am familiar with the litigation history of the case, having reviewed the litigation file. Having participated in the litigation, and based on the activities that have been necessary to pursue this claim to trial, I believe that the fees charged in this particular matter as testified to by Ms. Alday are reasonable, in light of the litigation history of the case. Among other things, this particular matter has been prepared for trial three times, due to scheduling issues through no fault of any particular person. That's the way the process works. But getting ready for trial three times gets to be fairly expensive. There have been eight motions to respond to filed by the opposition. You have to file written responses. That takes some time as well to do that work and research. In addition, there has obviously been the work of getting up to speed on the history of the case and what it's about. And in any construction dispute, there is a voluminous amount of documentation involved on any type of contract on construction, particularly on a prison job, that necessarily includes quite a bit of time. And I think that the approximately — Ms. Alday testified the actual number, the approximately sixty hours, I believe it was of Mr. Hughes, the approximately ninety hours that I had, approximately a hundred and ten hours for Mr. Christy, was very reasonable actually, in light of litigation history of the case. That's

my opinion. THE COURT: He's with you [Hughes, another attorney representing Allgood].

"MR. HUGHES: Let me ask one question, Mr. Crewdson. . . . I feel like I'm back in moot court. How about the total number, forty-eight thousand two hundred and seventy-six dollars and twenty-one cents for everybody combined? Is it your opinion that's reasonable? [CREWDSON:] Yeah. That entire amount, as testified to by Ms. Alday, in light of the litigation history, is reasonable, in my opinion. MR. HUGHES: Thank you, your Honor. THE COURT: Excuse me. Does that amount include any expenses other than lawyer time and paralegal time? THE WITNESS: That number does include approximately twenty-two hundred dollars of photocopying, subpoena fees, filing fees, various expenses involved, and couriers in getting a case to trial, and that does include about twenty-two hundred, and I find those expenses . . . certainly very reasonable, in light of the litigation history. THE COURT: Are you through, Mr. Hughes? MR. HUGHES: Yes, sir. THE COURT: You may cross-examine [Jester, trial counsel for Ray Bell and the surety].

"MR. JESTER: Thank you, your Honor. . . . It's not often I get to do this. [CREWDSON:] I know. I know you're enjoying it, too. Q. When was Alston and Bird hired to represent Allgood? A. We were retained, if I recall, in August of 1995, probably mid August, if my recollection is correct. Q. Two and a half months ago, approximately? A. Approximately. Seems like a long time. Q. If my notes are right, in that two and a half months, Mr. Hughes spent sixty-nine point one hours. You spent ninety point six hours. Your associate spent one point one hour, and your paralegal spent fourteen point eight hours. That's over a hundred and seventy hours in two and a half months; is that correct? A. That sounds about right, including the paralegal time. Q. Is it your opinion that a hundred and seventy hours of legal work in two and a half months is reasonable? A. Well, I believe it is when you consider getting prepared for trial three times, responding to eight motions. We've been involved in all eight motions. Q. Did you file motions of your own? A. I believe we did file a motion, four or five-page motion to dismiss. Q. Have you made any effort to break down this total attorney's fees, the amount attributable to the defense of Bell's counterclaim? A. I honestly would say that's a very, very, very minor part. I would be surprised if it was more than ten hours. Q. Can you tell the jury what exactly was spent . . . defending the counterclaim versus pursuing the claim against INA [the surety]? A. I would say in defending the Bell counterclaim by itself, it could not have been more than — I'll be very generous — twenty hours of time. Q. I understand that's your opinion it could not. Have you broken it down? A. I have not itemized that time because you cannot separate the two claims, and we haven't. Q. Have you

attempted to break down or itemize the time spent pursuing the claim for balance due versus extra work? A. We've not divided. The two are inseparable. Q. So you have not broken that time? A. We've not broken it out other than, obviously, the legal bills themselves. You may be able to do that. MR. JESTER: That is all I have, your Honor."

APPENDIX

## GLORIA A. ALDAY'S ATTORNEY FEES TESTIMONY

"[ROBERT L. CREWDSON (Allgood's trial attorney):] Are you the person that receives the legal bills at Allgood? [GLORIA A. ALDAY:] Yes, Sir. Q. Are you the person that reviews those? A. Yes, sir. Q. Are you the person that agrees to pay them? A. Yes, sir. Q. Okay. A. I sign the check. Q. In this particular case, did you review the invoices that came in on this matter? A. I sure did. Q. Okay. Do you recall specifically how many hours of attorney time have been put in this particular matter that you were billed for? A. No, sir. But I've got them in my notes. Q. Okay. Do you recall, sitting here without your notes, the various rates charged for those hours or the expenses? A. No, sir. Q. Okay. Would your notes refresh your recollection as to those amounts? A. Yes, sir. Q. Let me show you, once again, Exhibit P-39. I would like to ask you in terms of Mr. Hughes' time on this particular case, do you recall how many hours, now having been refreshed, that he has charged to Allgood? MR. JESTER [trial counsel for Ray Bell and the surety]: Your Honor, objection to the question. . . . THE COURT: All Right.

"BY MR. CREWDSON: Q. Ms. Alday, let's go back to what we were discussing. Do you recall, having now refreshed your recollection from Exhibit P-39, the number of hours incurred by Mr. Hughes involved in this case? A. Yes, sir. Q. How many hours was that? A. Sixty-nine point one. Q. What was the rate for Mr. Hughes' time? A. Two twenty-five an hour. Q. Okay. How many hours of my time have been charged in this litigation? A. Ninety point six. Q. What was the rate for my time? A. A hundred and ninety dollars an hour. Q. Okay. Was there also an hour or so charged for another associate at Alston and Bird? A. Yes, sir. One point one hour. Q. At what rate? A. One fifty. Q. How many hours of Mr. Christy's time was incurred and billed to you? A. A hundred and ten point two. Q. What was the rate for Mr. Christy's time? A. A hundred dollars an hour. Q. How many hours of paralegal time was charged on the case to you? A. Forty-two point eighty, total. Q. And how many hours for that, for the hours performed by the paralegals at Alston and Bird? What are the rate for that? A. Fourteen point eight. Q. What was the rate for the fourteen point eight? A. Forty-five dollars. Q. How about for Walker Hulbert? A. Twenty-eight. Q. Hours? A. Twenty-eight hours. I'm sorry. Q.

At what rate? A. Fifty dollars an hour. Q. And what was the total charged to you for both attorney and paralegal time in this case? A. The fees and expenses were forty-eight thousand two hundred seventy-six twenty-one. Q. And of that amount, how much were the fees and expenses that were charged to you? A. Forty-eight — the expenses? Q. Yeah? A. Two thousand two hundred sixty-four twenty-one. Q. Is forty-eight thousand two hundred seventy-six twenty-one dollars total? A. The total. Q. That you're seeking in this case from INA[, the surety]? A. Yes, sir. Q. Can you give us some sense, in terms of the task and activities required of your attorneys in this case, some of the things they have had to do? A. Well, we've been up here. This is our fourth time to come up and prepare. This is the third time to prepare for trial. We came up first to, we thought, on a settlement hearing. And we didn't get anywhere on that. And then we came another time, and Mr. Jester had something that was pending in another court, and we were sent home. Then last time we came and prepared, and then we got sent home. And today we — we've had to prepare for it three times. Q. And were you involved in each of those preparations? A. Yes, sir, I was. Q. Did that — each of these preparations involve a good deal of time? A. Yes, sir. Q. And in terms of other motions, and things like that, has your lawyer had to handle motions in this case? A. Yes, sir. They have had to handle different motions that they presented on summary judgment motions, and all that has been quite time-consuming. One was about the drawings that we had asked for the drawings, and all. Q. In terms of the motions and the preparing for a trial three times, and other things you've referenced, have you reviewed all of those activities and time indicated on the bills? A. Yes, sir. Q. Okay. Have you found any of those charges in your mind to be unreasonable? A. No, sir. Q. Have you had occasion in the past, as Allgood Electric to hire an attorney, from time to time, in middle Georgia? A. Yes, sir. Q. In those instances, have you found the fees charged by Mr. Christy's firm in this case to be comparable to the other fees that you incurred in middle Georgia for matters? A. Yes, sir. Q. And have you, in the process of getting ready for this case, or any other case, had occasion to investigate various rates involved in the Atlanta law firms? A. Yes. I talked with — talked with my cousin, Robert Whitley, about your rates. And he said those are in line. MR. JESTER: Objection your Honor hearsay.

"THE COURT: That's pretty much hearsay. It really is. What's the exception to it, if you have one?

"MR. CREWDSON: Your Honor, I don't have an exception to the statement she made. And I'm not asking you, Ms. Allgood (sic).

"THE COURT: Excuse me for a moment, please. Ms. Alday. Ladies and Gentlemen, that objection's well taken. Withdraw it from — remove it from your minds. It's not admissible. It's not appropri-

ate. Let me explain to you what hearsay really is so we don't have a debate on it. Hearsay is the attempt to prove the truth of something by a statement by a witness from which your information comes from a third person. And that third person is not here to tell us, to be cross-examined for the truth of it. As an example, if I'm trying to prove that it's raining outside, and I say to you, my wife called me on the telephone and told me it's raining outside, well, here we are sitting in a room with no windows. So if you want to believe it, you have to believe what my wife said, not what I say, because I don't know it from my own knowledge. That's true hearsay. Now, the rule has an enormous number of exceptions to it, which I'm not going to go into, at the moment. But basically, when you hear that kind of testimony and you hear what is said, I object to it, it's hearsay. That's what hearsay really is. This witness has just told us that trying to prove the reasonableness of these fees by the statement of a Mr. Whitley, who is not here for cross-examination. That's perfectly — that's perfect hearsay. And the objection was well-taken. Thank you.

"BY MR. CREWDSON: Q. Ms. Alday, did you have occasion to find out what Mr. Whitley's fee was? A. Yes, sir. Q. Okay. Was that fee comparable to the fees of . . . Alston and Bird? MR. JESTER: Objection, your Honor. There's nothing to base that comparison on. Mr. Whitley is not here. We don't know what kind of work he does. There's nothing to base that on. Further, previously she testified she's never been involved in litigation.

"THE COURT: I would hope we wouldn't have to go through a long testimony of counsel. But, generally how this is proved is by the lawyers themselves, how many hours you spent, what your fees are, and you're also an expert to express an opinion as to whether they are appropriate in the light of the industry you now sit in.

"MR. CREWDSON: Your Honor, I'll be glad to do that, too."

DECIDED DECEMBER 5, 1997 —

*Goldner, Sommers, Scrudder & Bass, Carroll G. Jester, Jr., William W. Horlock, Jr.*, for appellant.

*Walker, Hulbert, Gray & Byrd, Charles W. Byrd, John D. Christy, Alston & Bird, William H. Hughes, Jr., Robert L. Crewdson*, for appellee.