A94A1089. FIRST UNION NATIONAL BANK OF
GEORGIA v. DAVIES-ELLIOTT, INC.
(452 SE2d 132)

ANDREWS, Judge.

First Union National Bank of Georgia ("the Bank") appeals from the judgment entered on a jury's verdict in this case in which a former customer, Davies-Elliott, Inc., was awarded breach of contract and conversion damages and attorney fees and expenses under OCGA § 13-6-11.[1]

Viewed in favor of the jury's verdict, the evidence was that Elliott operated a number of businesses using corporations, including maintenance of railroad tracks in Georgia and other states. In order to conduct this business in Vidalia for the Georgia Central Railroad,

---

[1] Davies-Elliott also made claims for punitive damages. As to these claims, the jury found in favor of the Bank.

Elliott formed Davies-Elliott, Inc. with Davies, his then girl friend. In November 1990, Elliott went to the Vidalia branch of First Union and saw Ms. Willis in order to set up a commercial account for Davies-Elliott, Inc. When Willis asked him to provide a corporate resolution concerning the account, Elliott advised that the corporate documents were being finalized by his attorney. Willis proceeded to open the account and then provided Elliott with a corporate resolution form which he took along with the signature card. When he returned to the Bank, the signature card contained as authorized signers on the account both Elliott and Davies. A corporate resolution dated November 13, 1990 was also provided, on the Bank's form, reflecting that Elliott was president and treasurer and Davies was secretary of the corporation. Checks could be signed by either. Elliott was also the sole stockholder and director of the corporation.

Elliott and Davies also had a personal joint checking account at the Bank, a fact known to Willis.

Since the purchase of the Vidalia bank by First Union in 1987, all processing had been moved to Atlanta. A courier picked up the day's work every afternoon around 2:00 p.m. and took it to the service center in Atlanta. The commercial account signature card was stamped received in commercial bookkeeping in Atlanta on November 5, 1990.

In January 1991, Davies had signed a general power of attorney allowing Elliott to, among other things, sign her name to checks and other documents, since he conducted some of his business out of town.

Several months later, Elliott and Davies had a personal falling out. On March 5, 1991, Davies left their home and checked into a motel. On the evening of March 11, 1991, Elliott received a phone call from Davies who said she was in Mobile and would not be back. Elliott told her he was taking her name off of both checking accounts. He asked her if she had any checks and she denied it.

Davies-Elliott, Inc. used a system of checks issued in books of 25 and Elliott had 200 to 250 checks remaining in the series. On his corporate bank statement received March 29, 1991, checks numbered 1249 to 1428 were processed. Elliott looked at his remaining books of checks and could not tell that any were missing, even though he was aware that Davies had broken into the house before leaving town and taken her personal belongings. In fact, the last check in the last book, no. 1625, had been removed by Davies.

On Tuesday March 12, Elliott went to the Bank and spoke to a teller about removing Davies' name and was referred to Willis. Elliott informed Willis that he wanted Davies off his accounts. Elliott closed the joint personal account and opened a new one in his name only. Because he had a number of payroll checks outstanding on the corpo-

rate account, he asked Willis what to do. She gave him a "Customer Request For Name Deletion" form which he began to fill out and signed in her presence. She asked who he was going to substitute as a signatory and, since he did not know, he took the card with him.[2] Elliott had also obtained from the Bank a form for corporate minutes. On that form, on March 12, 1991, he recorded his meeting in which he, as sole director of the corporation, voted to remove Davies from office and revoke any authority to bind the corporation.

On March 14, Elliott returned the request form to the Bank. Pursuant to the power of attorney, he had signed Davies' name to the card and signed his name as witness. He gave the card to Willis, who noticed that he seemed upset. He asked her for assurance that there "was no way that anybody else can cash a check on this account but me, right?" She replied affirmatively. Upon looking at the card and seeing the corporate name and commercial account number, Willis realized that it was not appropriate for a commercial account, but was for use on a personal account. Although aware of this problem, Willis forwarded the card to Atlanta because she felt that commercial bookkeeping might go ahead and initiate the name removal. She did not contact Elliott about this problem or telephone or fax Atlanta.

The request card was stamped received on Tuesday, March 19, 1991, by the commercial bookkeeping section of the service center in Atlanta. Ms. Allen was the processor who handled matters from the Vidalia branch. Although she had no recollection of receiving the request, she stated that, because it was on a personal account form, upon receiving it she would have taken it to her unit leader for action.

Davies wrote check no. 1625 to herself in the amount of $35,500. The check was dated March 13 and deposited in her bank account in Louisiana on March 18, 1991. It was processed by the Federal Reserve System and received by Atlanta Federal Reserve on March 19. It entered the Bank's commercial bookkeeping division on the evening of March 19, 1991. Processor Allen also filed all checks and other documents for Vidalia accounts. The computer which initially sorted incoming checks would separate checks over $10,000 for processor's comparison of the check with the signature card. Upon arriving at work at 8:00 a.m., Bank procedure required that these large checks be handled by the processor first. Check no. 1625 would have been

---

[2] At trial, Willis testified that, during their initial conversation, she "assumed" that Elliott was discussing only his and Davies' joint personal account and not the corporate account. For purposes of review, this court takes the evidence with all factual disputes and inferences in favor of the jury's verdict. *Pendley v. Pendley*, 251 Ga. 30, 31 (1) (302 SE2d 554) (1983). Further, as a matter of law, if the account had been their personal joint account, the only way to change the terms of a multiple party account was to close it and reopen it under different terms or by a modification agreement signed by both parties. OCGA § 7-1-814; *Bank South v. Harrell*, 181 Ga. App. 64 (351 SE2d 263) (1986).

kicked out by the computer on March 19 and compared by Allen on March 20 with the original signature card on file for the account. However, since Davies' name was still on the card because the request form had not been processed, there would have been no action taken. The check cleared the Bank.

On Thursday, March 21, 1991, when commercial bookkeeping was told by Vidalia that checks were bouncing on the Davies-Elliott account, Wyatt, the supervisor of commercial bookkeeping, went back through the checks and discovered the one signed by Davies. Wyatt also located the request form in his department and went to the signature card and marked through Davies' name. He wrote on the card "Del. 3/12/91 notice rec'd 3/19/91 by C/B."

On Friday, March 22, Elliott took his ledger and went to the Bank because he had been notified that Davies-Elliott, Inc. checks were being returned for insufficient funds. He tried to see Willis who was busy with another customer and he dealt with Ramsey. Ramsey and he compared his ledger and the computer's listing of cashed checks and discovered the $35,500 check which he advised her he did not write. Ramsey called commercial bookkeeping in Atlanta and was told Davies had signed the check.

Ramsey got Willis, who talked to Atlanta and advised Elliott that the $35,500 was not going to be put back into the account.

Elliott contacted Truett, the Vidalia branch president, who told Elliott he was aware of the situation and the check would not be repaid.

The jury awarded Davies-Elliott, Inc. $35,500 (face amount of the check), the $300 in overdraft fees assessed against the account, and $52,000 in attorney fees.

1. The first two enumerations deal with attorney fees and will be considered together.

(a) The first is that the court erred in denying the Bank's motion for partial summary judgment, directed verdict, and for j.n.o.v. as to attorney fees because a bona fide dispute existed between the parties.

The Bank's contention concerning the denial of its motion for partial summary judgment is moot because of the subsequent entry of verdict and judgment and our conclusion that the evidence supports the verdict. *Schirmer v. Amoroso*, 209 Ga. App. 682, 683 (2) (434 SE2d 80) (1993); *Canal Ins. Co. v. Wilkes Supply Co.*, 203 Ga. App. 35 (1) (416 SE2d 105) (1992).

In its motion for directed verdict the Bank contended that there was no showing of bad faith or stubborn litigiousness to warrant consideration of attorney fees under OCGA § 13-6-11. This argument was premised on this court's prior opinion that Davies-Elliott was not entitled to partial summary judgment on the issue of the Bank's liability, *First Union Nat. Bank of Ga. v. Davies-Elliott, Inc.*, 207 Ga.

App. 791 (429 SE2d 161) (1993), and on the argument that failure to pay a claim does not in itself give rise to liability under OCGA § 13-6-11.

In *First Union*, supra, this court held that the trial court's ruling based on its analogy of this situation with a stop payment request under OCGA § 11-4-403 was improper primarily because it had been premised upon the affidavit of an expert in banking which could not alone support summary judgment. Id. at 792 (1). Questions of fact remained as to the nature of the Bank's duty, whether that duty was breached, and as to the Bank's defense based on constructive fraud.

"A directed verdict is not authorized unless the evidence and all reasonable deductions therefrom *demand* a certain verdict. OCGA § 9-11-50; [cit.]. And, where a directed verdict was denied and the jury has made a certain ruling, the evidence is to be construed in favor of the jury's finding and in favor of the non-movant, and a trial court cannot substitute its judgment for the jury's if there is 'any evidence' to support it. [Cits.]" *Deloitte, Haskins & Sells v. Green*, 198 Ga. App. 849, 852 (1) (403 SE2d 818) (1991); *Backus Cadillac-Pontiac v. Ernest*, 195 Ga. App. 579, 581 (2) (394 SE2d 367) (1990).

Even assuming, without deciding, that the existence of the prior appeal demonstrated a "bona fide controversy," under OCGA § 13-6-11, that does not preclude the jury's consideration of whether the Bank demonstrated "bad faith" in its dealings with Davies-Elliott, Inc. *Ostrom v. Kapetanakos*, 185 Ga. App. 728, 729 (2) (365 SE2d 849) (1988); *Jackson v. Brinegar, Inc.*, 165 Ga. App. 432, 436 (301 SE2d 493) (1983).

"As a general matter, determination of whether litigation expenses are to be allowed as a portion of damages is a matter for the jury. [Cits.] It is a question of fact whether a defendant has acted in bad faith or has been stubbornly litigious or caused unnecessary litigation and expense where there was no bona fide controversy. [Cit.] Likewise, it is 'for the jury to determine whether there was a bona fide controversy,' *McDevitt & Street Co. v. K-C Air &c.*, 203 Ga. App. 640, 645 (5) (418 SE2d 87) (1992), unless the facts preclude such a finding as a matter of law." *Webster v. Brown*, 213 Ga. App. 845, 846 (2) (446 SE2d 522) (1994).

" 'A judgment n.o.v. is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion. (Cits.)' *Stone v. Cook*, 190 Ga. App. 11, 12 (1) (378 SE2d 142) (1989)." *Ga. Ports Auth. v. Southeast Atlantic &c.*, 202 Ga. App. 318, 324 (3) (414 SE2d 232) (1991).

There was no error in denying the motion for directed verdict and j.n.o.v. on the basis that there was, as a matter of law, a bona fide

dispute. Nor was there error denying the motion for new trial on the same grounds. *Ga. Ports Auth.*, supra at 324 (4).

(b) The second enumeration is that the court erred in denying the j.n.o.v. on attorney fees because the amount awarded for attorney fees, $52,000, was not supported by the evidence.

Cheney, one of Davies-Elliott, Inc.'s two trial attorneys, testified concerning attorney fees and expenses. Cheney practiced in a firm with his brother and sister-in-law. Edenfield, the second trial attorney, practiced by himself, did not keep time records, and was handling the case on a contingency basis. Edenfield did not testify or present any evidence on the attorney fees issue.

Cheney testified that the case was also being handled by his firm as a contingency case, although his firm, as a matter of practice, kept time records on all their cases. Cheney testified that, for his firm, a total of 269 hours had been spent pre-trial by lawyers in his firm and that $100 was a reasonable hourly rate for the area. He stated that his brother and sister-in-law worked on aspects of this case, but provided no specifics. Except as to meetings in which he personally participated, any knowledge of his as to work performed by others would be hearsay and would not support an award of attorney fees. *Mitcham v. Blalock*, 214 Ga. App. 29, 32 (2) (447 SE2d 83) (1994).

"A court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. [Cit.]" *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 403 (1) (433 SE2d 606) (1993). Here, however, there was no evidence of the percentage contingency which either firm was charging. Compare *Walther v. Multicraft Constr. Co.*, 205 Ga. App. 815, 817 (3) (423 SE2d 725) (1992). The amount of attorney fees awarded, $52,000, is nearly one-and-one-half times the amount of damages awarded and cannot be said to be reasonable. Id. at 817 (4).

Also, here there was a finding in favor of the Bank on the claims for punitive damages and no recovery of attorney fees attributable to these claims could be had. *Mitcham*, supra at 33 (2). Therefore, the award for attorney fees is vacated and the case remanded for an evidentiary hearing on the amount of reasonable attorney fees. Id.

2. The third enumeration alleges error in the trial court's denial of the Bank's motion for directed verdict, new trial, or j.n.o.v. on Davies-Elliott's breach of contract claim. At trial in its motion for directed verdict and in the motion for j.n.o.v., the Bank alleged that there was no evidence of a contract between Davies-Elliott and therefore, the Bank could not have been found guilty of any breach

thereof.[3]

The signature card by which the account was opened was introduced by Davies-Elliott, Inc. and the Bank. It states that "[i]t is agreed that FUNB-GA will recognize the signatures below in the payment of funds or in the transaction of other business for the account(s). I/We agree to the terms and conditions of the FUNB-GA Depositor's Agreement for this account(s) and authorize FUNB-GA to establish my/our account(s)."

"The deposit agreement, if any, the signature card and the checks drawn against the account are the contract documents between the bank and the customer." *Fed. Deposit Ins. Corp. v. West*, 244 Ga. 396, 399 (260 SE2d 89) (1979); *944, Inc. v. Ga. State Bank*, 198 Ga. App. 893, 894 (1) (403 SE2d 466) (1991).

Therefore, there was evidence from which the jury could conclude that there was in effect a written contract. Id. Even absent such a contract, however, there was at least evidence sufficient to raise the issue of an implied trust. *944, Inc.*, supra at 895 (1).

The Bank's argument that a change in authorized signers on the corporate account could not be made without a contemporaneous corporate resolution based on language in the deposit agreement is also unavailing. The agreement states that "[y]ou are required to provide us with any resolutions which change the authorized signature(s)." It does not state that providing the resolution is a condition precedent to the effectiveness of any change in signatories.

Even assuming, however, that the document could be so read, there is no question that the Bank opened the account without a contemporaneous resolution and, therefore, was required to notify Davies-Elliott, Inc. of its intent to rely on strict compliance with the contract. OCGA § 13-4-4. The issue of whether there had been a joint departure from the contract terms is ordinarily a question for the jury. *Cho v. South Atlanta Assoc.*, 200 Ga. App. 737, 739 (2) (409 SE2d 674) (1991); see *Rossville Bank v. Southeast Fed. &c. Bank*, 192 Ga. App. 384, 386 (2) (385 SE2d 9) (1989).

Therefore, denial of the motion for directed verdict or j.n.o.v. on the stated ground was not error.

3. The Bank's fourth enumeration alleges error in the trial court's failure to give its Requests to Charge Nos. 5, 6, 9, and 11, which dealt with the formalities required for a corporate officer, here Davies, to properly execute documents, and delegate duties, and the formalities of authenticating corporate documents.

---

[3] Although other legal arguments are presented in the brief on appeal, they were not included in the motions for directed verdict or j.n.o.v., and will not be considered here for the first time. *Glenridge Unit Owners Assn. v. Felton*, 183 Ga. App. 858 (2) (360 SE2d 418) (1987).

All of these requests to charge were premised on the Bank's contention that the Request for Name Deletion had not been properly executed by Davies or by Elliott under the power of attorney, and, therefore, the Bank was not obligated to do anything regarding the request until a formal corporate resolution had been provided. As discussed in Division 3, supra, the jury could decide if the course of conduct between the parties altered the technical requirements of the agreement.

"The existence of a corporation cannot be attacked by persons who have dealt with it as a corporation. [Cits.]" *Walker v. Joanna M. Knox & Assoc.,* 132 Ga. App. 12, 13 (2) (207 SE2d 570) (1974). It follows that once such a course of conduct by the Bank has been shown, instruction on the technical requirements of complying with the formalities is unnecessary, as not adjusted to the evidence. *Stinson v. Allstate Ins. Co.,* 212 Ga. App. 179, 182 (2a) (441 SE2d 453) (1994). There was no error.

4. Enumerations 5 through 7 deal with claimed errors in the charge as given and are considered together.

(a) The language objected to in enumeration no. 5 was that the Bank "may not disclaim its responsibility for its lack of good faith exercised towards the depositor." Also, the court charged that "[a] bank may not limit the measure of damages for a lack or failure to exercise ordinary care in handling deposits or payments for a depositor." The language in the charge is based on OCGA § 11-4-103 (1) which provides that "the provisions of [Article 4] may be varied by agreement *except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure. . . .*" (Emphasis supplied.)

The objections voiced below were that this charge was not appropriate because "there has been no attempt by the bank to disclaim its responsibility. There is no issue of lack of good faith. . . . [W]e haven't attempted to limit any measure of damages."

Willis' testimony, however, was that the reason she forwarded the improper form of request to Atlanta to see if commercial banking would take any action was because of indemnification language which was contained on that form. Therefore, there was some evidence to support the charge given.

(b) The charge objected to in the seventh enumeration was that dealing with a mutual departure from the terms of the contract. The Bank argues there was no evidence to support such a charge. As discussed in Division 2, there was such evidence and the charge as given was not in error.

(c) The final objected-to charge deals with constructive fraud, asserted by the Bank in defense of the action.

Although not clear from the enumeration of error and the argument, we discern that the Bank complains only of the following sentence regarding this defense: "[b]efore a party is entitled to relief on the ground of fraud, deceit, or misrepresentation, it must appear that the party asserting fraud used ordinary care to find out the facts and protect against the loss." The objection made was that it was "in essence saying we [the Bank] had an affirmative duty where he didn't disclose to ask him. That duty to find out and discover the fraud is applicable only where the fraud is active, not passive, or not by nondisclosure."

The objected-to sentence followed a page and one-half of the Bank's Requests for Instruction Nos. 12, 13, 14, and a portion of No. 15, dealing with constructive fraud. As set out in the Bank's answer to the complaint, the Bank contended that it was induced by this fraud, "whether actual or constructive, to do the alleged acts upon which the Complaint is based. . . . Plaintiff omitted to tell . . . that the name deletion form was executed through a power of attorney, Davies had been removed as secretary of Plaintiff, Davies had threatened to remove monies from [the] account. . . ."

" '[I]n an arms-length business or contractual relationship there is no obligation to disclose information which is equally available to both parties. (Cits.) Under such circumstances, actionable fraud cannot be shown unless the (party alleging fraud) exercised due care to discover the fraud. (Cit.) . . .' *Southern Intermodal Logistics v. Smith & Kelly Co.*, 190 Ga. App. 584, 585 (1), 586 (379 SE2d 612) [(1989)]." *First Union Nat. Bank of Ga. v. Gurley*, 208 Ga. App. 647, 649 (1) (431 SE2d 379) (1993).

There was no error in the charge given.

5. Finally, the Bank enumerates the denial of its motion for directed verdict, j.n.o.v. or new trial on the conversion claim in which Davies-Elliott, Inc. sought to recoup the $300 in overdraft charges assessed by the Bank after check no. 1625 was paid and not reimbursed.

The initial motion made by the Bank was directed at its contention that Davies-Elliott, Inc. was alleging that the payment of the $35,500 check was a conversion of those funds. After clarification that the claim being tried was only for conversion of the overdraft charges, the only motion made by the Bank was "I certainly contend there was no conversion with regard to the funds on the overdrafts."

Denial of the motion as stated was not error, since, if the payment of the check was improper, the overdraft charges were improper. *Ga. Ports Auth.*, supra.

*Judgment affirmed in part, reversed in part and case remanded. Beasley, P. J., and Johnson, J., concur.*

Decided November 22, 1994 —
Reconsideration denied December 6, 1994 — 

*Newton, Smith, Durden, Kaufold & Rice, Howard C. Kaufold, Jr.*, for appellant.

*Spivey, Carlton & Edenfield, J. Franklin Edenfield, Glen A. Cheney*, for appellee.