A01A0185, A01A0186. PAUL et al. v. DESTITO; and vice versa.

(550 SE2d 739)

RUFFIN, Judge.

Ralph Destito sued Douglas Paul, Sharon Paul, Catspaw Productions, Inc. ("CPI"), Catspaw, Inc. ("Catspaw"), Atlanta Catco, Inc. ("Catco"), and Recording Studio, Inc. ("RSI") for fraud, negligent misrepresentation, conspiracy to breach fiduciary duty, negligent breach of fiduciary duty,. alter ego liability, amounts due on a promissory note, attorney fees, costs, and punitive damages. CPI counterclaimed, asserting that Destito owed it in excess of $44,000.

A jury found for Destito on each count and against CPI on its counterclaim. With respect to punitive damages, the jury further concluded that defendants "acted, or failed to act, with a specific intent to harm Plaintiff Ralph Destito." The trial court denied the majority of defendants' motions for directed verdict and judgment notwithstanding the verdict ("j.n.o.v."). As to Destito's claim for litigation expenses, however, the trial judge granted defendants' j.n.o.v. motion. The parties filed cross-appeals, challenging various aspects of the trial court's decision on the motions for directed verdict and j.n.o.v. For reasons that follow, we affirm and remand for further proceedings.

On appeal from a trial court's rulings on motions for directed verdict and j.n.o.v.,

> we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments n.o.v. are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom[,] demands a certain verdict. Thus, a judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. If the evidence is conflicting, or if insufficient evidence exists to make a "one-way" verdict proper, judgment n.o.v. should not be granted. Further, when considering these motions, trial and appellate courts must view the evidence in the light most favorable to the party securing the jury verdict.[1]

Viewed in this light, the evidence shows that Douglas Paul provides "voice-over" services for television commercials, radio advertisements, and other broadcasts. In 1984, Paul created Catspaw to

---

[1] (Citations and punctuation omitted.) *Dunaway v. Parker*, 215 Ga. App. 841, 849 (4) (453 SE2d 43) (1994).

market his voice-over talent. Although he was the sole shareholder, his wife, Sharon Paul, was an officer and a director of the company. In April 1986, Douglas and Sharon Paul, along with Sarah Cotton, formed CPI to produce and sell radio and television commercials, audio-visual productions, and voice-overs for clients. Destito joined CPI as an employee in 1986, earning up to $100,000 per year as the company's sales manager. The evidence showed that the Pauls were officers and directors of CPI.

Shortly after CPI began operations, the Pauls, Cotton, and Destito formed RSI. Although the parties originally intended RSI to be a state-of-the-art recording studio, in actuality, it simply leased recording equipment to CPI. Destito invested $750 into RSI and loaned it $2,375 in return for a promissory note from the company. Like Cotton, Destito became a 24.5 percent shareholder in RSI. The Pauls each received 25.5 percent of the stock. All four shareholders became directors of the corporation, and Destito was named vice president.

In 1987, the Pauls loaned RSI $130,000 for the purchase of recording equipment to lease to CPI. Under the lease arrangement, CPI paid RSI $25 per hour for use of the studio recording equipment. Destito agreed to that rental rate in 1987, finding it "reasonable" and "appropriate" at the time. He also understood that RSI would be paid the rental rate regardless of which company actually owned particular pieces of equipment in the studio.

In 1989, the Pauls formed Catco, which they wholly owned, to purchase and hold title to real estate that became a production studio for CPI. At that time, RSI's assets were pledged as collateral for the loan Catco obtained to purchase the property, a fact Destito did not discover until after this litigation began. CPI eventually moved into the studio and paid rent to Catco. CPI also bought new recording equipment for the studio in 1989. When he learned about this purchase, Destito became concerned:

> When I ultimately discovered that we were purchasing that equipment through CPI versus RSI, I asked Sharon [Paul] about that because I was a little confused. We were making the move to the big building. There was a lot of excitement. We started to get some traction with the business; and I asked her, why aren't we doing this through RSI? I was told RSI couldn't qualify for the loan.

At that point, Destito began questioning the $25 rental rate and suggesting that RSI charge CPI more for using the recording equipment. In 1989, Destito raised this issue with Sharon Paul, who told him that "it wouldn't make any difference to [raise the rate]. RSI

wouldn't make any money anyway; and . . . as we build these companies up, everybody will be taken care of." Destito also began questioning certain intercompany expenses allocated against RSI. Again, Sharon Paul told him, "[RSI] wouldn't make any money. Don't worry about it." According to Destito, Sharon Paul referred to the various companies as "one big pie."

In 1991, CPI and RSI experienced cash flow problems. RSI's management — including Destito — agreed to suspend all payments from CPI to RSI so that CPI could pay vendors and employees, such as Destito. At the end of 1991, Cotton left the business, surrendering her RSI stock. Effective January 1, 1992, her stock was redistributed and Destito, Sharon Paul, and Douglas Paul each became thirty-three and one-third percent shareholders in RSI. Destito testified that the companies "made it through" the financial crisis and CPI began making money. In 1993, he thought "the studio" was doing very well. Nevertheless, CPI did not pay RSI any of the money that it owed the company, and RSI continued to show business losses.

At the end of 1994, Destito was promoted from sales manager to Senior Vice President of New Business Development at CPI. The Pauls also changed Destito's compensation package from a salary to straight commission. Douglas Paul told him, "we're going to give you accounts. We'll assign accounts to you so as to . . . not put you at a financial disadvantage." Under the new compensation scheme, Destito received a $6,000 "draw" or advance each month, which he then "earned" by generating monthly sales commissions of at least $6,000. If he generated less than $6,000 in monthly commissions, he owed the difference to CPI.

According to Destito, his new position did not work out as planned. Despite the Pauls' promises, accounts were not assigned to him, and he saw decreases in his pay. Although the Pauls told Destito to take the accounts he wanted from other salesmen, Destito believed that Douglas Paul, the new sales manager, should reassign accounts to him to avoid conflicts with the sales team. Eventually, Destito wrote to the Pauls, suggesting that he be compensated on a salary/commission, rather than a draw/commission, basis, and that any deficit of unearned draw be erased. At a subsequent meeting about compensation, Sharon Paul stated, "we'll keep it going."

In early 1996, Destito learned that the Pauls had executed documents in 1995 merging RSI into CPI. Destito, who had not been informed of the merger, demanded to know how it could proceed without his knowledge or consent. The evidence showed that, before the merger, the Pauls told their attorneys that Destito had "abandoned" his stock, wanted nothing more to do with the company, and did not object to the merger. After Destito raised objections, a certificate of correction was filed with the Secretary of State purporting to

"undo" the merger.

Relations between Destito and the Pauls continued to deteriorate, and CPI fired Destito on February 16, 1996. At that time, CPI demanded that Destito repay $44,107.77 in unearned draw that he had received from CPI. In April 1996, Destito was removed from RSI's Board of Directors, and he was no longer an officer of the corporation.

Destito filed this lawsuit in May 1996 and proceeded to trial, claiming, among other things, that the defendants siphoned money from RSI, concealed improper financial dealings from him, and used recording equipment without paying RSI rental fees. The jury found against all defendants on Destito's claims for fraud, negligent misrepresentation, conspiracy to breach fiduciary duty, negligent breach of fiduciary duty, suit on promissory note, alter ego liability, punitive damages, and litigation expenses. The jury also found for Destito on CPI's counterclaim for the $44,107.77 Destito allegedly owed in unearned draw. It awarded Destito $489,727 in actual damages, $90,000 in litigation costs and expenses, and $450,000 in punitive damages.

The trial court upheld the jury's verdict on all counts except Destito's claim for litigation expenses. As to that claim, the trial judge concluded that Destito presented insufficient evidence to support the award.

In Case No. A01A0185, defendants appeal the trial court's denial of their motions for directed verdict and j.n.o.v. on Destito's claims for fraud, negligent misrepresentation, conspiracy to breach fiduciary duty, negligent breach of fiduciary duty, amounts due on a promissory note, alter ego liability, and punitive damages. In Case No. A01A0186, Destito appeals the trial court's order granting defendants' motion for j.n.o.v. on his litigation expense claim.

## Case No. A01A0185

In their brief on appeal, defendants assert that Destito placed immaterial testimony and documents before the jury, portrayed the Pauls as greedy and inconsiderate, and "obtained a verdict shockingly disproportionate to any conceivable damages." Defendants, however, do not raise as error the admissibility of any evidence or the size of the damages award, precluding us from addressing those issues.[2] Instead, they focus on several issues that provide no basis for reversal.

---

[2] See *In the Interest of J. M.*, 237 Ga. App. 298, 300 (2), n. 1 (513 SE2d 742) (1999) ("[T]his Court will consider an issue only if it has been properly enumerated as error on appeal.").

1. Defendants first argue that the trial court erred in not granting their motions for directed verdict and j.n.o.v. on Destito's fraud and negligent misrepresentation claims because, as a corporate insider, Destito could not reasonably rely on the alleged fraud or misrepresentations.

Fraud has five essential elements: (1) a false representation or omission of material fact; (2) scienter; (3) an intent to induce the party alleging fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.[3] Defendants' argument rests solely on justifiable reliance. They do not contend that Destito's fraud and misrepresentation claims failed to meet any of the other four essential elements.

According to defendants, Destito's claims hinged on allegations that (1) RSI was intended to be the exclusive owner of recording equipment used by CPI and (2) the Pauls misallocated to CPI assets and revenues that properly belonged to RSI. They argue that Destito knew CPI purchased recording equipment in 1989 and thus could not rely on any belief that RSI would be the sole equipment provider. They further claim that Destito knew about, and participated in, other decisions affecting RSI, such as setting the equipment rental rate at $25 and suspending payments from CPI to RSI in 1991.

Destito also alleged, however, that the Pauls — both RSI directors — failed to disclose to him certain decisions regarding RSI to which he was not privy. For example, he testified that the Pauls failed to inform him that all of RSI's assets had been pledged as collateral for a loan procured in 1989 by Catco, the Pauls' real estate holding company. Destito also presented evidence that the Pauls executed documents merging RSI into CPI without his knowledge. "It is well settled that corporate officers and directors have a fiduciary relationship to the corporation and its shareholders and must act in good faith."[4] According to Destito, because the Pauls had a fiduciary relationship to him, as an RSI shareholder, their failure to disclose amounted to actionable fraud.[5]

Moreover, Destito testified that his fraud allegations stemmed in part from the Pauls' representations about his draw/commission com-

---

[3] *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (537 SE2d 138) (2000); see also *Real Estate Intl. v. Buggay*, 220 Ga. App. 449, 452 (3) (469 SE2d 242) (1996) (noting that "the same principles apply to both fraud and negligent misrepresentation").

[4] *GLW Intl. Corp. v. Yao*, 243 Ga. App. 38, 42 (3) (c) (532 SE2d 151) (2000).

[5] See OCGA § 23-2-53 ("Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."); *Tigner v. Shearson-Lehman Hutton, Inc.*, 201 Ga. App. 713, 715 (411 SE2d 800) (1991) ("Where one person sustains towards another a relation of trust and confidence, his silence when he should speak or his failure to disclose what he ought to disclose constitutes fraud in law just as do actual affirmative false representations.").

pensation plan with CPI. According to Destito, he accepted the new compensation plan based on the Pauls' promise to assign him certain accounts and their assurances that he would not be "put . . . at a financial disadvantage." Destito further testified that, despite their promises, the Pauls never assigned him specific accounts and his pay decreased.

As noted above, defendants' attack on appeal rests solely on justifiable reliance; they do not address the other essential elements of fraud and negligent misrepresentation.[6] The record shows that Destito knew RSI was losing money and showed those losses on his tax returns. From Sharon Paul's statements in 1989, Destito also knew that, in the Pauls' view, RSI would never make money. Yet, defendants have pointed to no evidence that Destito knew about the RSI asset pledge or merger, and the evidence does not demand a finding that Destito could not justifiably rely on the Pauls to inform him of these management decisions.[7] Similarly, nothing in the record indicates that, as a matter of law, Destito could not rely on the Pauls' representations regarding his compensation scheme with CPI.[8] Accordingly, the trial court did not err in denying defendants' motions for directed verdict and j.n.o.v. on this ground.[9]

2. Defendants also argue that Destito's fraud and negligent misrepresentation claims were barred by the statute of limitation, entitling them to judgment. We disagree.

A four-year statute of limitation governs actions for fraud and negligent misrepresentation.[10] As noted in Division 1, Destito claimed that the Pauls' failure to disclose the RSI/CPI merger to him in 1995 constituted fraud. He also asserted at trial that representations made by the Pauls in 1994 regarding his CPI compensation package were fraudulent. Destito filed suit on May 6, 1996, placing those fraud and misrepresentation allegations clearly within the statute of limitation.

In addition, Destito indicated that he did not learn that RSI's assets had been pledged as collateral for Catco's loan until he began

---

[6] We note that proof of one or more of these other essential elements may be lacking. For example, it is unclear whether Destito suffered any damage from the alleged failures to disclose and misrepresentations discussed above.

[7] See *Gen. Information Processing Systems v. Sweeney*, 176 Ga. App. 315, 316 (335 SE2d 722) (1985) ("Due to the fiduciary relationship [between corporate officers and the corporation and shareholders] may rely implicitly, not only on what is said, but also on the supposition that nothing important will be left unsaid by the officer.") (punctuation omitted).

[8] See *Riviera Finance v. McBride*, 221 Ga. App. 321 (471 SE2d 233) (1996).

[9] See *Dunaway*, supra.

[10] OCGA § 9-3-31; *Hardaway Co. v. Parsons, Brinckerhoff, Quade &c.*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997); *McClung Surveying v. Worl*, 247 Ga. App. 322, 324 (1) (541 SE2d 703) (2000).

reviewing documents during this litigation. Although the asset pledge occurred in 1989, "where the actual fraud is the gravamen of the action . . . the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered."[11] Defendants do not argue that Destito should have discovered the asset pledge at some earlier time, outside the statute of limitation. Accordingly, the trial court did not err in refusing to find, as a matter of law, that the statute of limitation barred Destito's fraud and negligent misrepresentation claims.

3. Defendants also argue that the four-year statute of limitation in OCGA § 9-3-31 precluded Destito's conspiracy to breach fiduciary duty and negligent breach of fiduciary duty claims. Assuming, without deciding, that § 9-3-31 applies, we find that the trial court properly denied defendants' motions for directed verdict or j.n.o.v. on this ground.

Defendants assert that Destito's fiduciary duty claims revolve solely around the Pauls' decision to purchase equipment in 1989 through CPI, rather than RSI, and the agreement in 1991 to suspend all payments to RSI.[12] Destito argues, however, that the Pauls breached their fiduciary duty to him when they tried to merge RSI out of existence without informing him in late 1995. He further argues, and presented evidence at trial, that the Pauls kept inaccurate financial information for RSI, requiring them to "reconstruct[ ]" the company's financials in 1996. In addition, Destito argues, and the record shows, that the Pauls, who were officers, directors, and the sole shareholders of CPI by 1992, did not cause CPI to pay RSI for equipment rentals, even when CPI had a profitable year in 1993.

These and other alleged breaches occurred within the four-year limitation period defendants advocate. Defendants do not claim, and we will not decide on appeal, that these activities do not constitute breaches of fiduciary duty. The trial court properly found that the statute of limitation did not bar these claims.[13]

4. Defendants further argue that the fiduciary duty claims are barred by estoppel or waiver. They cite *Smith v. Hanna Mfg. Co.*[14] for

---

[11] *Shipman v. Horizon Corp.*, 245 Ga. 808-809 (267 SE2d 244) (1980).

[12] Defendants assert that RSI's management agreed to "shut down" or "take RSI dormant" in 1991. In contrast, Destito testified that management agreed only to suspend payments to RSI "for a period of time until we saw things moving in a direction that would allow us to make things as they were before." Construing the evidence favorably to the verdict, we cannot conclude that RSI was completely "shut down" in 1991.

[13] On appeal, defendants assert that *all* of Destito's fiduciary duty and fraud claims fall outside the statute of limitation. They do not argue that the trial court erred in allowing the jury to consider particular allegations of fraud or fiduciary breaches that might be time-barred. Defendants also do not enumerate as error the size of the damages award or claim that specific allegations barred by the statute of limitation factored into that award.

[14] 68 Ga. App. 475, 487-488 (23 SE2d 552) (1942). See also *Marshall v. W. E. Marshall Co.*, 189 Ga. App. 510, 511 (2) (376 SE2d 393) (1988).

the proposition that

> [i]f . . . a party having an interest to prevent an act being done has full notice of its having been done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have had if it had been done by his previous license.[15]

According to defendants, Destito knew about and acquiesced in CPI's 1989 purchase of recording equipment and the 1991 decision to suspend payments to RSI.

As noted above, however, Destito's breach of fiduciary duty allegations extend beyond these two incidents. On appeal, defendants point to no evidence that Destito acquiesced in all the alleged breaches of fiduciary duty, including the merger of RSI into CPI. "Where the facts relied on to establish the estoppel do not unequivocally show an estoppel in pais, the jury, and not the judge, should determine whether the facts constitute such an estoppel."[16]

The evidence did not demand a finding that Destito was estopped from bringing his breach of fiduciary duty claims. Accordingly, the trial court did not err in denying defendants' motions for directed verdict and j.n.o.v. on this ground.[17]

5. Defendants further argue that Destito was estopped from seeking recovery on his promissory note from RSI because he agreed that the note would not be paid. Destito never testified, however, that he forgave RSI's promissory note. Instead, he indicated that he knew RSI would not have income to pay back the note during the period when management suspended payments to RSI. Defendants have pointed to no evidence conclusively establishing that Destito agreed not to seek payment. Accordingly, defendants were not entitled to a directed verdict or j.n.o.v. on this estoppel claim.

6. In their next enumeration of error, defendants assert that the trial court erred in failing to grant their motions for directed verdict and j.n.o.v. on Destito's alter ego liability claim because "Georgia law does not allow a person who is a shareholder, director, and officer of a corporation to 'pierce the veil' of his own corporation."[18] We disagree

---

[15] (Punctuation and emphasis omitted.) *Smith*, supra.

[16] (Punctuation omitted.) *Marshall*, supra at 512 (2).

[17] See *Dunaway*, supra.

[18] Defendants' claim of error relating to alter ego liability is limited to this one assertion. They do not question Destito's use of the alter ego theory to pierce the corporate veil in reverse by holding a corporation (such as Catco) liable for its shareholders' obligations. See *Plaza Properties v. Prime Business Investments*, 240 Ga. App. 639, 643 (2) (d) (524 SE2d 306)

with this broad statement.

Georgia courts pierce the corporate veil "to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or evade contractual or tort responsibility."[19] The theory applies when " ' "there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist." ' "[20] Courts have used the concept in various situations. For example, in *Cheney v. Moore*,[21] we found that a 50 percent shareholder and director of a corporation had presented sufficient evidence to pierce the corporation's veil. We reject defendants' sweeping assertion that, in all cases, Georgia law prohibits a director, officer, or shareholder from piercing the corporate veil.[22] Thus, the trial court did not err in refusing to find Destito's alter ego liability allegations legally insufficient on this ground.

7. Defendants further contend that they were entitled to a directed verdict and j.n.o.v. on Destito's punitive damages claim. They argue that because the evidence demanded a defense verdict, no punitive damages should have been awarded. As we held above, however, the trial court did not err in denying defendants' motions for directed verdict and j.n.o.v. as to Destito's fraud and breach of fiduciary duty claims. Defendants also argue that the jury improperly found that they specifically intended to harm Destito, a finding that removed the $250,000 cap on punitive damages imposed by OCGA § 51-12-5.1 (g).[23]

The imposition of punitive damages is generally a question for the jury, and we will uphold that award if there is any evidence to support it.[24] Under OCGA § 51-12-5.1 (b), punitive damages may be

---

(1999), aff'd, 273 Ga. 97 (538 SE2d 51) (2000). Defendants also do not contend in their enumerations of error that Destito presented insufficient evidence to pierce the corporate veil in this case. Accordingly, we will not address these issues on appeal. See *In the Interest of J. M.*, supra; *Gunsby v. State*, 248 Ga. App. 18, 22 (3) (545 SE2d 56) (2001) ("A party cannot use his brief to expand his enumerations of error to include issues or rulings not raised in the enumerations of error.").

[19] (Punctuation omitted.) *Cheney v. Moore*, 193 Ga. App. 312-313 (1) (387 SE2d 575) (1989).

[20] *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 306 (2) (404 SE2d 607) (1991).

[21] Supra.

[22] We note that RSI was the only company in which Destito held an ownership interest. Furthermore, by the time Destito brought his claims in May 1996, he was no longer an officer or a director of RSI.

[23] OCGA § 51-12-5.1 (f).

[24] *Crosby v. Kendall*, 247 Ga. App. 843, 848 (2) (b) (545 SE2d 385) (2001); see also *Home Ins. Co. v. Wynn*, 229 Ga. App. 220, 223 (2) (493 SE2d 622) (1997) ("A breach of fiduciary duties is sufficient to support an award of punitive damages. Whether punitive damages should be awarded for a breach of fiduciary duties is ordinarily a question for the jury.") (punctuation omitted).

awarded in tort actions "in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."

Destito presented evidence that, because the Pauls did not want business partners, they had been planning to shut RSI down since 1992. The evidence further indicated that the Pauls failed to keep accurate financial records for RSI and did not inform Destito of RSI's asset pledge, which benefitted Catco. In addition, CPI failed to make equipment rental payments to RSI, even when CPI made money. Destito also testified that the Pauls tried to merge RSI into CPI without consulting him, and the evidence showed that the Pauls told their attorney in 1995 that Destito had abandoned his RSI shares and no longer wanted to be part of the company.

Viewed favorably to the verdict, this and other evidence supports the award of punitive damages, as well as the jury's conclusion that defendants specifically intended to harm Destito.[25] The trial court properly denied defendants' challenge to the punitive damages award.

8. In their final enumeration of error, defendants argue that the trial court erred in not granting them a directed verdict or j.n.o.v. on CPI's counterclaim. According to defendants, the undisputed evidence showed that Destito received from CPI $44,107.77 in monthly advances or "draw" during 1995 and early 1996 that he never earned or repaid. Destito contends that, although CPI initially placed him on a draw/commission compensation scheme in 1995, the Pauls soon switched him back to a salaried employee. In his view, the "draw" CPI alleges he received every month was actually his earned salary.

The record reveals that Destito suggested to the Pauls that he be placed back on a salary compensation scheme and that the deficit in his "draw" account be eliminated. According to Destito, although Sharon Paul told him, "we'll keep it going," the Pauls decided "to pay [him] on a salary." Destito noted that the W-2 forms he received from CPI for 1995 and 1996 indicated that he earned "wages." Further-

---

[25] *Crosby*, supra. Defendants argue that the evidence does not support a finding that Catspaw (and presumably Catco) specifically intended to harm Destito. The jury, however, found for Destito on his alter ego theory and, when asked to "identify the individuals and corporations[ ] whom you find should be treated as *alter egos* of each other," responded: "Sharon Paul, Doug Paul, [CPI], [Catspaw], [Catco], [RSI]." We must give the jury's verdict a reasonable construction. OCGA § 9-12-4; *American Petroleum Products v. Mom & Pop Stores*, 231 Ga. App. 1, 7-8 (4) (497 SE2d 616) (1998). Construing the verdict reasonably, the jury concluded that all corporate and individual defendants were alter egos of each other and should be treated as the same "personality." Given the jury's verdict and defendants' failure to successfully attack the alter ego finding, we have no basis for separating any of the companies from the punitive damages award in this case.

more, balance sheets for CPI revealed only $199.14 in employee advances at the end of 1995.

Defendants presented evidence that Destito's compensation remained on a draw/commission basis. On cross-examination, Destito admitted that his February 1996 termination letter demanded repayment of the $44,107.77 and that he received monthly account statements reporting the balance in his "draw" account. Defendants' former financial consultant also testified that the Internal Revenue Service ("IRS") asks employers to report income advances as "wages" on an employee's W-2 form. In addition, the financial consultant explained that, since CPI reported employee draws to the IRS as wages, the company books reflected the amounts as salary, rather than as employee advances.

Defendants' evidence, however, merely created a factual dispute that the jury resolved in Destito's favor.[26] At least some evidence supported Destito's claim that the monthly $6,000 payments were salary, rather than an advance on commission. The trial court properly denied defendants' motions for directed verdict and j.n.o.v.[27]

### Case No. A01A0186

9. In Case No. A01A0186, Destito challenges the trial court's decision granting defendants a j.n.o.v. on his claim for litigation expenses. Under OCGA § 13-6-11, "[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." The jury determined that Destito was entitled to recover these expenses, awarding him $90,000.

In granting defendants' motion for j.n.o.v., the trial court did not conclude that the jury improperly found Destito entitled to litigation expenses. Instead, the trial court determined that Destito presented insufficient evidence of the actual expenses:

> [Destito] introduced no detailed evidence from which the jury could ascertain what each of [Destito's] attorneys did, [Destito] introduced no time records, billing records or records of any kind regarding the time spent or services rendered by the several attorneys who represented [Destito],

---

[26] See *Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 647 (522 SE2d 467) (1999) (" 'Where there is any evidence upon which the verdict can be based, the jury is free to disbelieve whatever facts are inconsistent with their conclusion and the court cannot substitute its conclusion for that of the jury.' ").

[27] See *Dunaway*, supra.

and [Destito] introduced no evidence sufficient to show the function of the tasks performed by those attorneys with the particularity required to support an award of attorneys' fees. Moreover, the testimony of [Destito's] lead counsel regarding his generic activities and those of the other attorneys will not support such an award. Finally, [Destito] failed to introduce evidence of the amount of attorneys' fees incurred pursuing [Destito's] affirmative claims as opposed to defending the counterclaim of [CPI].

At trial, Destito's counsel testified to the number of hours various attorneys spent on the case, the hourly rates charged by those attorneys, and other costs incurred. He further testified that the time spent and the amounts charged were reasonable and necessary. His testimony did not allocate the hours worked to any particular tasks or designate the amount of billable time spent defending against CPI's counterclaim.

We agree with the trial court that Destito presented insufficient evidence from which a jury could reasonably calculate his litigation expenses. He offered no billing records or other evidence describing, with any particularity, how the attorneys spent their time. Furthermore, much of counsel's knowledge and testimony about "work performed by others would be hearsay and would not support an award of attorney fees."[28] Destito also did not separate out expenses incurred defending against CPI's counterclaim, which are not recoverable under OCGA § 13-6-11.[29] The jury's award of $90,000 in litigation expenses was improperly based on guesswork.[30]

Destito argues that, even if the jury had no basis to reasonably calculate litigation expenses, defendants were not entitled to judgment on this claim. According to Destito, the proper remedy was for "the trial court to conduct a hearing on the issue of attorneys' fees and expenses." We agree.[31] Accordingly, we affirm the trial court's

---

[28] *First Union Nat. Bank &c. v. Davies-Elliott, Inc.*, 215 Ga. App. 498, 503 (1) (b) (452 SE2d 132) (1994); see also *Southern Co. v. Hamburg*, 233 Ga. App. 135 (503 SE2d 383) (1998) (" '[H]earsay, even when admitted into evidence without objection, lacks probative value to establish any fact.' ").

[29] *Lineberger v. Williams*, 195 Ga. App. 186, 188 (3) (393 SE2d 23) (1990). This case is distinguishable from *Ins. Co. of North America v. Allgood Elec. Co.*, 229 Ga. App. 715 (494 SE2d 728) (1997), which Destito cites to support his claim for expenses relating to CPI's counterclaim. In *Allgood Elec.*, the plaintiff presented evidence that the defendant engaged in "wanton and excessive indulgence in litigation." (Punctuation omitted.) Id. at 719 (3) (a). Destito presented no similar evidence, and, as noted in his brief, he clearly based his claim for litigation expenses on "bad faith in the form of fraud." (Punctuation omitted.)

[30] See *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402 (433 SE2d 606) (1993).

[31] See *First Union*, supra at 503; *Banks*, supra.

decision that Destito failed to present sufficient evidence of reasonable litigation expenses and remand this case for an evidentiary hearing on the amount of expenses to be awarded Destito.[32]

*Judgment affirmed in Case No. A01A0185. Judgment affirmed in Case No. A01A0186 and case remanded with direction. Johnson, P. J., and Ellington, J., concur.*

DECIDED JUNE 22, 2001 —
RECONSIDERATION DENIED JULY 19, 2001 — ■

*Smith, Gambrell & Russell, Rex M. Lamb III, Nations, Toman & Nutter, Michael T. Nations, David C. Nutter*, for appellants.
*Lawrence E. Newlin, Frank R. Olson*, for appellee.

---

[32] See *First Union*, supra. The record shows that defendants received summary judgment on certain claims originally brought in Destito's complaint. On appeal, the parties argue at length about whether defendants were entitled to j.n.o.v. because Destito failed to allocate his litigation expenses between successful and unsuccessful claims. Destito argues that defendants must pay for all his expenses, including those relating to his unsuccessful claims. In support, he cites *CSX Transp. v. West*, 240 Ga. App. 209, 212 (3) (b) (523 SE2d 63) (1999), which indicates that "the award of attorney fees is not apportioned to only those attorney fees attributable to the claims on which the plaintiff( ) prevailed." Defendants assert that *West* is not good law and must be overruled in light of *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145 (475 SE2d 601) (1996). In *Peacock*, the Supreme Court reversed a lump sum attorney fee award because the plaintiffs "did not prove the amount of attorney fees attributable solely to the claim in which they prevailed." Id. at 147 (2). The trial court did not address this issue, and we need not reach it for our decision. We note, however, the Supreme Court's clear statement in *Peacock* that "[a] prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim." Id.

